No. 42,309

Frank J. Ablah, et al., *Appellees,* v. Ray H. Eyman, *Appellant.*

(365 P. 2d 181)

Opinion filed October 9, 1961.

*Clyde Wendelken,* of Wichita, argued the cause, and *Henry E. Martz* and *Charles B. Hughes,* of Wichita, were with him on the briefs for appellant.

*Kenneth H. Hiebsch,* of Wichita, argued the cause, and *Milton Zacharias, Richard A. Render, Albert L. Kamas, Donald E. Lambdin* and *David G. Arst,* of Wichita, were with him on the briefs for appellees.

The opinion of the court was delivered by

Fatzer, J.: This case involves the working papers of a public accountant. The action was in replevin to recover certain books and records alleged to be owned by appellees, plaintiffs below, to which appellant, defendant below, filed his third amended cross petition with his third amended answer. The amended cross petition contained four causes of action: The first sought to recover actual damages for "the value of the use" of the property alleged to have been sustained by appellant, based upon "the usable value and money savings to the plaintiffs" by their wrongfully obtaining possession of the books and records, and presents the principal question involved; the second pertained to nominal damages, and damages "for expenses and time expended in pursuit of possession

of the said property"; the third was for the balance due on account for professional services, and the fourth was for punitive damages in the amount of $55,000. The appeal is from an order sustaining appellees' motion to strike the allegations of actual damages in the first cause of action, and for damages for pursuing the property as alleged in the second cause of action.

The parties will be referred to as they appeared in the court below.

The action was commenced on Saturday morning, September 19, 1959, at 8:23 a. m. Plaintiffs filed their petition, affidavit in replevin, and undertaking in replevin, and an order for delivery of property was issued by the clerk of the district court. All papers necessary to file the action were prepared and executed by plaintiffs three days before—on Wednesday, September 16, 1959, except the undertaking in replevin which was prepared and executed the following day, Thursday, September 17. The petition alleged plaintiffs were the owners and entitled to immediate possession of the personal property in the possession of defendant, as follows:

"All books, records, journals, ledgers, correspondence, documents, checks, statements, receipts, memorandum, detailed recordings of deposits to and withdrawals from all bank accounts, analyses of bank accounts, summaries, reports, adjusting journal entries, identifying source documents and all other instruments and records of every kind and nature for and pertaining to the years 1948 through 1956 which in any way involve or pertain to these plaintiffs, or transactions affecting them, or any of them, including business partnerships and accounts known as Ablah Hotel Supply Company, Ablah Manufacturing Company, Ablah Meadows, Ablah Building Account and the corporation Ablah Hotel Supply Company, Inc., now in the possession of the defendant, Ray H. Eyman, which personal property includes but is not limited to the following: (describing records pertaining to bank accounts of six of the plaintiffs in two banks in Wichita)."

The affidavit for replevin alleged the personal property had an aggregate or actual value of $12,457.75, and was wrongfully detained by defendant. In accordance with G. S. 1949, 60-1007, plaintiffs' undertaking in replevin was in the sum of $24,915.50.

Service of summons was obtained upon defendant on Saturday morning, September 19, 1959, at approximately 11:00 o'clock. The records in question were secured by the sheriff at the same time. Defendant was temporarily impecunious and unable over the week end of September 19-20, to post a redelivery bond in the amount of $24,915.50 within twenty-four hours (G. S. 1949, 60-1007), and was unable to secure a return of the records to his possession. On

Monday morning, September 21, 1959, the district court issued its order to the sheriff of Sedgwick County directing him to hold all books and papers obtained from defendant in replevin and then in his hands until the further order of the court. Plaintiffs perfected an appeal from that order, and on April 6, 1960, it was heard on the merits. On May 14, 1960, the order was held to be void and was set aside. (*Ablah v. Eyman*, 186 Kan. 626, 352 P. 2d 10.) Following reversal, the records were delivered to plaintiffs.

Courts may judicially notice earlier proceedings in the same case (*In re Estate of Rothrock*, 173 Kan. 717, 723, 252 P. 2d 598; *Schauf v. Peter Kiewit & Sons Co.*, 187 Kan. 180, 183, 354 P. 2d 687), and, as a background to defendant's allegations for actual damages pleaded in the first cause of action, reference is made to two affidavits filed in this court on October 22, and October 30, 1959, by plaintiffs and their presently employed public accountants during the pendency of *Ablah v. Eyman*, supra. Those affidavits are summarized and quoted as follows: It was essential that plaintiffs have immediate possession of the aforesaid records, books, information, data, and so forth, in time to prevent "an adverse tax determination against these appellants in an amount in excess of $25,000"; further, that on July 23, 1959, plaintiffs received notices of proposed income tax deficiencies in an aggregate amount of $79,673.23 plus estimated interest of $27,885.55; that such notices required the filing of formal protests with the Bureau of Internal Revenue within 30 days; that plaintiffs secured a 60-day extension in which to file said protests, and on October 22, 1959, thirteen separate protests were filed on their behalf; that it was absolutely necessary plaintiffs have the books and records which were the subject of the action prior to a hearing before the Appellate Division of the Bureau of Internal Revenue, which was expected in the very near future; that if plaintiffs were "denied such records a wholly unjustified adjudication of tax liability would be made against them and for which the records contained data constituting a legitimate defense," and, "that because of the volume and complexity of the records and the limited time prior to the hearing, it would be impossible to reconstruct the records and data which are the subject of this action."

In his third amended answer defendant specifically denied possession of any of the personal property itemized in the petition and affidavit for replevin, "except certain papers, work sheet analyses, schedules, statements, reports, records, correspondence and memo-

randa prepared or made by the Defendant or received in connection" with his employment by plaintiffs, which were particularly described and identified in Exhibit A attached to his amended answer. (Exhibit A is attached to the opinion as an appendix, and for brevity, items described therein are hereafter referred to as "working papers" or "work sheets.") Defendant further specifically denied that plaintiffs or anyone acting in their behalf had requested or made demand for delivery of the personal property itemized in the petition and in the possession of the defendant and alleged there was no refusal or failure by him to deliver the same; that the aggregate and actual value of the personalty itemized in the affidavit of replevin was $12,457.75; that said personalty had an actual or aggregate value, or a market value, or a salable value, and that he wrongfully detained any papers or records of plaintiffs or that they had any ownership of, or immediate or superior right of possession to, any personal property in his possession.

Further answering, defendant alleged that at all times material, he was a duly practicing public accountant; that he was employed by plaintiff Frank J. Ablah in November, 1955, to make an audit or audits necessary to determine taxable income in connection with an investigation of the Internal Revenue Service for the years 1949-1954 for himself and other named plaintiffs; that he was paid in excess of $12,000 for his services and there was a balance due of $459.50 plus interest; that upon completion of the audit he rendered a final report in writing to plaintiffs with a copy to the Internal Revenue Service reflecting proposed adjustments of taxable income previously reported by plaintiffs in federal income tax returns for the years 1949-1954; that plaintiffs knew he did not have possession of the other personal property itemized in the affidavit of replevin (the original books and records covering several business years prepared and built by defendant) since he delivered the same to them prior to their filing the action; that the working papers prepared or made by him or received in connection with his employment had been in his possession in excess of two years prior to the filing of the action; that in the absence of any written or oral agreement the working papers prepared or made by him or received in connection with his employment were his property; that said working papers were a part of his office records, were personal to him, were the product of his own work, services and efforts, were confidential in nature and subject to his exclusive control and

use and were the only basis open to him to substantiate, prove or justify the validity and accuracy of the final report rendered to plaintiffs with a copy to the Internal Revenue Service; that he was the sole owner and only person entitled to the possession or use of the working papers; that he was acting as an independent contractor and in a professional capacity in his employment with plaintiffs; that the working papers were made while he was engaged in his own profession or business; that they contained computations, notations and typed words which belonged to him; that he was not employed to make those working papers, but they were merely a means to an end and were made solely for his own assistance in reaching the end result of adjusting taxable income previously reported and in making a final written report to the plaintiffs; that with the full consent, knowledge and authority of Frank J. Ablah, for himself and the other plaintiffs, he was to effect adjustments to plaintiffs' taxable income for the years 1949-1954, by reviewing the final report with revenue agents assigned to the audit then being made by the Internal Revenue Service; that the final report of his audit of plaintiffs' taxable income was submitted to and accepted by the plaintiffs, and that his professional services were terminated.

In the first cause of action of the amended cross petition defendant made the allegations of the third amended answer a part thereof and further alleged that plaintiffs improperly filed the summary replevin action on Saturday, September 19, 1959, at 8:23 a. m., and erroneously alleged an aggregate and actual value of $12,457.75 and obtained service of summons upon him, and wrongfully deprived him of the property set forth in Exhibit A at 11:00 o'clock a. m. on the same day,

*"for the purpose of wrongfully and unjustly depriving the Defendant of the value of the use thereof, which usable value and money savings to the plaintiff, Frank J. Ablah, and those for whom he acted as agent or with authority and who are Real Parties in interest, are as follows:*

*"Cost to reaudit Plaintiffs' books and records for purpose of making a determination of Plaintiffs' income tax liabilities for the six years, 1949 through 1954, at the reasonable and customary charge of $10.00 per hour for preparation time of 4,000 hours . . $40,000.00*

*"Time saving to prevent '. . . adverse tax determination . . . in an amount in excess of $25,000.00,' as set forth in Affidavit filed in The Supreme Court of the State of Kansas . . . . $25,000.00*

*"Time saving to prevent additional interest for period of one year preparation time on '. . . income tax deficiencies in an ag-*

gregate amount of $79,673.23 plus estimated interest of $27,-885.55; . . .,' as set forth in Affidavit filed in The Supreme Court of the State of Kansas and executed by Grant R. Webster, $6,450.00

"Total ....... ... .. ..... .. .. .. ... .......... .....$71,450.00"

Defendant made all the allegations of the third amended answer and all the allegations of the first cause of action a part of his second cause of action, and further alleged plaintiffs erroneously alleged ownership and immediate right to possession of the working papers described in their petition and affidavit for replevin; that Frank J. Ablah knew at the time he executed the verified pleadings on September 16, 1959, and when they were filed and service of summons was obtained upon defendant on September 19, 1959, and knew at all times subsequent that plaintiffs had no ownership in or immediate right to possession of the working papers and that they had no right to keep possession to the exclusion of defendant; that plaintiffs knew defendant was entitled to possession and use of the papers and that any contrary or insistent possession or use by them was improper and a wrongful invasion and denial of the property rights of the defendant; that defendant was entitled to nominal damages of $5,000 for the deprivation of the right to use and possess the property and to *damages in the amount of $4,000.00 for expenses and time expended in pursuit of possession of the said property."*

As previously indicated, the third cause of action was to recover the balance due for professional services in the sum of $459.50.

Defendant made all the allegations of the third amended answer and all those of the first and second causes of action a part of the fourth cause of action, and further alleged that plaintiffs fraudulently, maliciously and intentionally filed the replevin action with full knowledge that defendant did not have the personal property alleged in the affidavit for replevin; that the personal property he possessed belonged to and was owned by him; that plaintiffs knew he was the only person entitled to possession and use of the working papers and that their seizure wrongfully deprived him of possession and use, caused him inconvenience and expense and attorney fees in the protection and recovery of the property; that plaintiffs knew the aggregate value of the property itemized in the affidavit for replevin was nil; that said property had no actual value or market or salable value and that by erroneously alleging an aggregate or actual value of $12,457.75 and posting an undertaking in replevin

of $24,915.50, they and each of them could fraudulently and maliciously prohibit the defendant, whom they knew to be temporarily impecunious, from posting a redelivery bond pursuant to G. S. 1949, 60-1007, and wrongfully deprive him of possession and use of his property for an extended period; that the combined reputed net worth of plaintiffs was $1,000,000, and that defendant was entitled to punitive and exemplary damages of $55,000.

The prayer was that defendant be awarded possession of the property; that plaintiffs be ordered to deliver the same to him, and that he have judgment against plaintiffs for $135,909.50 with interest, and costs.

Plaintiffs filed a five-paragraph motion to strike from the third amended answer and cross petition. The first paragraph was directed to that portion of the third paragraph of the first cause of action which reads, "for the purpose of wrongfully and unjustly depriving the defendant of the value of the use thereof," upon the ground the allegation was a "conclusion, alleges no ultimate fact with respect to damages upon which the defendant can recover against the plaintiffs, and is prejudicial to the plaintiffs."

The second paragraph was directed to the same paragraph of the first cause of action and to that portion which reads, "which usable value and money savings to the plaintiff . . . totaling $71,450." The motion sought to strike the allegation upon the ground it was a "conclusion, alleges no proper elements of damage upon which the defendant can recover against the plaintiffs, and is prejudicial to the plaintiffs."

Paragraph 4b was directed to the second cause of action relating to recovery by defendant of "alleged expenses and time" in pursuit of the property and sought to strike the allegation upon the ground it was "not a proper recoverable element of damage in favor of the defendant and against the plaintiffs."

The foregoing paragraphs of the motion to strike were sustained, and those portions of the first and second causes of action have been quoted and italicized above to assist the reader to readily observe the allegations which were ordered stricken by the district court. All the other paragraphs of the motion were overruled. No allegations were stricken from the third and fourth causes of action.

We turn to the merits of the appeal. At the outset it is observed this record presents an unusual case in replevin. The facts and circumstances alleged, the peculiar subject matter of the action,

and the valuation of the use of the property for damages, all present some degree of novelty and difficulty. Unlike the replevin of, for instance, an animal, an automobile, or some other similar species of personal property having an actual or market value, no matter when or by what means the defendant regains possession of the property, most, if not all, of its usable value to him is gone and the mechanical process of replevin cannot undue it by decreeing possession of the property in him.

Plaintiffs do not contend the order sustaining their motion to strike was not a final order (G. S. 1949, 60-3302, 60-3303), or that its effect was to strip defendant of all allegations for actual or compensatory damages and for damages for expenses and time expended in pursuit of the property. Hence, for the purpose of a decision upon the correctness of the order to strike, well-pleaded allegations of the first and second causes of action, including those stricken, must be accepted as true and every reasonable inference must be indulged in favor of the defendant in determining the questions of law presented as applied to the pleaded and conceded facts. (*Smith v. Jones,* 145 Kan. 892, 67 P. 2d 506; *White v. Thompson,* 181 Kan. 485, 312 P. 2d 612; *Wendler v. City of Great Bend,* 181 Kan. 753, 316 P. 2d 265; *King v. King,* 185 Kan. 742, 347 P. 2d 381; *Rockhill, Administrator v. Tomasic,* 186 Kan. 599, 352 P. 2d 444.) Whether allegations of defendant's cross petition can be supported by evidence is not before us.

It is the duty of the pleader to state the premises, the ultimate facts, in simple and concise language, and the duty of courts to declare the conclusions. A general allegation of ownership of specific property may constitute the pleading of an ultimate fact. (*Preston v. Shields,* 159 Kan. 575, 579, 156 P. 2d 543.) Where, however, as in the instant case, a party sets forth fully and in detail the specific facts upon which he predicates his ownership or title, the additional general allegations that he holds title or that he is the owner of the property, is surplusage and constitutes a conclusion of the pleader which is not admitted on demurrer, or, as here, on a motion to strike. (*State, ex rel., v. Ancient Order of United Workmen,* 178 Kan. 69, 76, 283 P. 2d 461; *Pierce v. Schroeder,* 171 Kan. 259, 264, 232 P. 2d 460.) Assuming that, as alleged, defendant was the sole owner and entitled to the exclusive possession of the working papers, a great part of their usable value has been transferred *in toto* to plaintiffs. On the other hand, if, from the facts

alleged, defendant was not the owner and entitled to possession of them, and if plaintiffs were at all times the lawful owners, they would be entitled to possession and at least nominal damages by reason of defendant's wrongful detention. Hence, necessarily, our first inquiry is directed to the question whether, as a matter of law, defendant was the owner of the working papers under the facts alleged.

Generally speaking, working papers are the computations and rough notes that an accountant makes in the practice of his profession. They are not "scratch paper" writings because they are compiled far more carefully. Typically, they are clearly labeled, and the computations made on them are explicitly described. For the most part, they contain only accounting data, but they sometimes contain brief narrative explanations as well. They constitute a record of the audit work performed, both from a qualitative and quantitative standpoint. That is to say, they constitute proof of what records were examined, what confirmations were undertaken, what inquiries were made, and so forth. The extent to which the audit work was planned and supervised may be evident from them, and they are the accountant's proof of the accuracy of his audit and the fairness of the opinion which he expresses in his reports to his clients. Often they are drafted in pencil instead of pen and ink which in no sense detracts from the careful workmanship ordinarily used by accountants in compiling them. There is a close analogy between the rough notes collected by an attorney and the working papers prepared by an accountant. An attorney collects preliminary rough notes and uses those memoranda as raw material for the preparation of briefs, pleadings, and other legal documents. An accountant, on the other hand, places his preliminary data on working papers and then uses them as the basis for financial statements, audit certificates, and other accounting reports to his clients. Working papers, then, accomplish the same purpose for accountants that rough notes perform for attorneys. (Schugerman's Accounting for Lawyers, 1952; Shannon's Legal Accounting, 1951; Saul Levy's Accountants' Legal Responsibility, 1954.) Authors of legal encyclopedias classify working papers as literary property, and the law dealing with that property has been held to be applicable to their ownership and custody. (34 Am. Jur., Literary Property and Copyright, § 9, p. 407; 18 C. J. S., Copyright and Literary Property, § 16b.) See, generally, Fourth Decennial Digest, Vol. 20, Literary

Property, p. 1474, and *Ipswich Mills v. Dillon,* 260 Mass. 453, 157 N. E. 604, 53 A. L. R. 792.

It is generally held that the ownership of working papers of an accountant is determined by the contractual relation under which the professional services are rendered. An accountant may prepare working papers in the capacity of an employee, or an independent contractor. If he is an employee, the ownership vests in the employer, but if he is an independent contractor, ownership vests in the accountant. (Shannon's Legal Accounting, 1951, p. 325.) See, also, CPA Handbook, Ch. 15, p. 10 (American Institute of Accountants, 1956 Ed.). In 34 Am. Jur., Literary Property and Copyright, § 9, p. 407, the rule is stated:

". . . When an independent contractor, such as an accountant, is employed to perform work such as preparing an income tax return, the employer has no property right in the papers made and prepared by the independent contractor solely for his own assistance, even though these papers may embody information which is confidential and important to the employer."

In *Ipswich Mills v. Dillon,* supra, it was held that work sheets are working papers on which original compilations, computations and analyses are made by an accountant, which later are gathered together in a summary form and the figures rendered in a schedule, exhibit, report or return upon which the accountant is working. It was also held that where accountants are employed as independent contractors to make an audit and prepare a tax return, working papers made by them while engaged in their own business were their property and a surrender of them to the employer could not be compelled. In the opinion it was said:

"The work sheets, as defined by the trial judge, were the defendants' property. They were made by them while engaged in their own business. The paper on which the computations were made belonged to them. They were not employed to make these sheets. The sheets were merely the means by which the work for which the defendants were employed might be accomplished. The title to the work sheets remained in the defendants after the computations were made. In the absence of an agreement that these sheets were to belong to the plaintiff, or were to be held for it, they were owned by the defendants. . . ." (p. 457.)

As tending to bear on this point see *Application of House,* 144 F. Supp. 95; *United States v. Boccuto,* 175 F. Supp. 886, and *Sale v. United States,* 228 F. 2d 682.

Allegations of the defendant and inferences most favorable to them are to the effect that he was a public accountant and was

employed by plaintiffs in November of 1955 as an independent contractor to prepare a set of books and records from original source documents of plaintiffs' businesses for the years 1949-1954, and to audit those books and records to determine taxable income in connection with an Internal Revenue Service investigation of plaintiffs for those years. In the course of his professional services, defendant developed certain working papers described in Exhibit A. Without making a detailed summary of the items described, it may be said they were working papers or sheets prepared or received by defendant in connection with, or incident to completing the books and records of plaintiffs' businesses, and in making the audit. Upon completion of his work, he rendered a final written report to plaintiffs which they accepted, proposing adjustments to each plaintiffs' taxable income previously reported on income tax returns filed by them for the years in question; forwarded a copy to the Internal Revenue Service, and delivered the original books, records, and all original source documents to the plaintiffs, retaining, however, his working papers here involved. For his services, defendant was paid in excess of $12,000, and his employment was terminated.

Accepting the well-pleaded facts as true, which we are required to do under the rule heretofore set forth, we are of the opinion the property involved in this action was working papers of defendant, developed and prepared in the course of his professional business pursuant to his employment by plaintiffs as an independent contractor, and that title and ownership thereof was vested in him when the action was commenced. (34 Am. Jur., Literary Property and Copyright, § 9, p. 407; *Ipswich Mills v. Dillon,* supra; Shannon's Legal Accounting, 1951, p. 325.) Hence, plaintiffs had no immediate or exclusive right to possession of the property and defendant was wrongfully deprived of its possession and use when taken from him on September 19, 1959.

Defendant was entitled to plead his claimed right for compensation by cross petition (*Brandtjen & Kluge, Inc., v. Lucas,* 153 Kan. 138, 143, 109 P. 2d 197), and we are brought to the question of the measure of his recovery and the remedy and proof available to him, to determine whether the district court erred in sustaining either paragraph 1 or 2, or both, of the motion to strike. Again, our approach to this question is in accordance with the foregoing rule that well-pleaded allegations of the first and second causes of action, including those stricken, are accepted as true and every reasonable

inference is indulged in favor of the defendant. While defendant was paid in excess of $12,000 for his services, that sum in no wise enters into the question of the amount of recovery resulting from the unlawful seizure and detention of his working papers.

Actions in replevin restore to the owner the possession of property of which he was deprived (G. S. 1949, 60-1010), and although they are restitutionary in character, they are classified as tort actions. The rules for determining the measure of recovery in tort are built upon the basis of full compensation for the injury and damage sustained. (Restatement of the Law, Torts, § 901, pp. 536, 537.) When a right to a remedy exists, the injured party is entitled to full indemnity for all the damage to which the wrongdoer's responsibility extends. In determining the measure of compensation, the law of torts ordinarily does not take into account, as do the rules based upon unjust enrichment, the benefits received by the defendant. (Restatement of the Law, Torts, § 901, p. 538.) It is well settled that where property has a value on account of the use to which it may be .put, as distinguished from its value for sale or consumption, the successful party in a replevin action is entitled to recover the value of such use during the time the property was wrongfully seized and detained. A few of our many cases on the point are: *Bell v. Campbell,* 17 Kan. 211, Syl. ¶ 1; *Kennett v. Fickel,* 41 Kan. 211, Syl. ¶ 5, 21 P. 93; *Werner v. Graley,* 54 Kan. 383, Syl. ¶ 1, 38 P. 482; *Bank v. Showers,* 65 Kan. 431, Syl. ¶ 4, 70 P. 332; *Sansone v. Studebaker Corporation,* 106 Kan. 279, Syl. ¶ 3, p. 282, 187 P. 673, and *Krueger v. Schlemeyer,* 145 Kan. 469, Syl. ¶ 4, 66 P. 2d 395.

A plaintiff who without right or title seizes the property of another by a writ of replevin is as much a wrongdoer as a defendant in an action for conversion. In *Sansone v. Studebaker Corporation,* supra, it was said there can be no difference in the measure of recovery where property is wrongfully taken in an action in replevin and where property is wrongfully taken without a writ of replevin. The value of the use of the property taken can be recovered in either kind of action.

Generally speaking, the right of property in a thing is the legal right to exercise dominion and control over it. As we have seen, the working papers were such that defendant had a property right in them, and that they had only a limited or special use is self-evident. They related only to plaintiffs' businesses, and income tax returns

for the years the Internal Revenue Service was investigating plaintiffs. It was alleged they had no actual or market or salable value, but it was not alleged they had no usable value. Their true value lay in their intellectual content, measurable only in their use by either plaintiffs or defendant. Once plaintiffs gained possession of the working papers, they could, and we are advised they did, copy them and use them in their tax problems. So copied and used, they became markedly more valuable to plaintiffs and their value to defendant was practically gone. A benefit is conferred where the party using the property is saved expense or loss which might otherwise be incurred. (Restatement of the Law, Restitutions, § 1 [b], p. 12; *Olwell v. Nye & Nissen Co.*, 26 Wn. 2d 282, 173 P. 2d 652, 169 A. L. R. 139.) The word "benefit" denotes any form of advantage.

The very essence of the nature of property is the right to its exclusive use. Without it, no beneficial right remains. Plaintiffs cannot be heard to say that, because defendant's papers had been in his files for over two years and he ostensibly had no present use for them, their wrongful invasion of his property right to exclusive use is not a loss compensable in law for which he can recover the value of their use. To hold otherwise would be subversive of all property rights since plaintiffs' use was wrongful and without claim of right. (*Olwell v. Nye & Nissen Co.*, supra.) The loss of that property right is the basis of defendant's cross petition, and that part of the order sustaining the first paragraph of the motion to strike was erroneous. It had the effect of striking out defendant's right to recover the value of the use of his working papers and precluded him from offering evidence of the value of that use, that is, the exchange value in money to plaintiffs, taking into consideration the purpose for which they were sought and the urgency of that purpose; the use to which they were put and the extent of that use, and the benefits derived therefrom. See *Liggett & Myers Tobacco Co., Inc. v. Meyer*, 101 Ind. App. 420, 194 N. E. 206, and *Ryan & Associates v. Century Brew. Ass'n*, 185 Wash. 600, 55 P. 2d 1053, 104 A. L. R. 1353. The allegation, "for the purpose of wrongfully and unjustly depriving the defendant of the value of the use thereof," was improperly stricken and it is hereby restored to the first cause of action.

Is defendant's right of action and measure of recovery confined to damages resulting from an invasion of his right, or may he re-

cover the value of the use of his property based upon benefits plaintiffs received from their use of it? We think he had an election of remedies. Generally speaking, torts may be divided into two classes: (1) Where the tort-feasor receives a benefit from his wrongful act, and (2) where the tort-feasor derives no financial gain from his wrongful conduct. (Anno. 169 A. L. R. 143.) With respect to the first class of torts, a tort-feasor is ordinarily liable to the other, at the latter's election, either for the damage done to the other's interests or for the value of the benefit received through the commission of the tort. (Restatement of the Law, Torts, § 903, Comment b, p. 540.) In Restatement of the Law, Restitution, Ch. 7, pp. 523, 524, and 525, the rule is stated:

"Certain actions, however, are classified as tort actions, although they are restitutionary in that they restore the plaintiff to his former position by taking from the defendant what he had wrongfully acquired, or its value. This is true of actions of replevin and ejectment, both of which restore to the possession of the owner property of which he was deprived, or under modern statutes in the case of replevin, its value. . . .

"However, in all of these cases a typical quasi-contractual situation exists and even though the tort actions normally produce results which are similar to those produced by the quasi-contractual actions, the fact that the defendant was a wrongdoer does not limit the injured party to a tort action. . . .

"The granting of relief by way of general assumpsit in such situations originated in the fiction of an implied agreement by the defendant to compensate the plaintiff for the benefit received. . . . With increasing recognition of a restitutional basis for the action, however, relief of this nature has been given in a variety of situations in accordance with the general principle stated in § 3, to the effect that a person who obtains a benefit from a tort committed by him at the expense of another is under a duty of compensating the other for the value of the benefit thus received. To require the wrongdoer to pay the value of what he has improperly received is ordinarily demanded by justice. . . ."

See, also, Restatement of the Law, Torts (Damages), § 903, Comment b, p. 540.

This court has recognized the foregoing rule and has consistently held that whenever one person commits a wrong or tort against the estate of another, with the intention of benefiting his own estate, as is here alleged, the law will, at the election of the injured party, imply or presume a contract on the part of the wrongdoer to pay the party injured the full value of all benefits resulting to the wrongdoer. (*Stewart v. Balderston*, 10 Kan. 131; *Tightmeyer v. Mongold*, 20 Kan. 90, 91; *Fanson v. Linsley*, 20 Kan. 235, 239; *Smith v. McCarthy*, 39 Kan. 308, 311, 18 P. 204; *Lipscomb v. Bank*, 66 Kan.

243, 246, 71 P. 583; *Hewey v. Fouts,* 91 Kan. 680, 683, 139 P. 407; *Flick v. Murdock,* 115 Kan. 862, 865, 225 P. 119; *Scherger v. Union National Bank,* 138 Kan. 239, 246, 25 P. 2d 588.) The rule is known as the resulting benefit rule (*Challis v. Hartloff,* 136 Kan. 823, 826, 18 P. 2d 199), and it is based, at least in part, upon the principle that no one should be allowed to enrich himself unjustly at the expense of another; also, upon the premise that where property has been wrongfully detained from another, the law imposes a duty to return it and to pay the value of the use, which may be treated as the result of an implied contract. (*Orozem v. McNeill,* 103 Kan. 429, 431, 175 P. 633; rehearing denied 103 Kan. 694, 176 P. 106.) The duty to pay is based upon the principle announced by Lord Mansfield in *Moses v. Macferian,* 2 Burr. 1005, 1012, that whenever, according to the principles of natural justice and equity a wrongdoer ought to pay, the law imposes a duty to pay (*Tightmeyer v. Mongold,* supra; *Scherger v. Union National Bank,* supra; *Black v. City of Lawrence,* 113 Kan. 518, 521, 215 P. 297; *Witmer v. Estate of Brosius,* 184 Kan. 273, 277, 336 P. 2d 455), and the value of the use of property may be recovered on the basis of quasi-contractual obligation. (*Fanson v. Linsley,* supra, pp. 238, 239; 1 Am. Jur., Actions, § 52, p. 444; 12 Am. Jur., Contracts, § 6, p. 503; Restatement of the Law, Restitution, § 128, p. 533, and comment i; also, notes on Restatement of Restitution, § 128, p. 190.)

A person upon whom a tort has been committed and who brings an action for the benefits received by the tort-feasor is sometimes said to "waive the tort." The election to bring an action of assumpsit, that is, to sue on the implied contract for benefits received by the wrongdoer is not, however, a waiver of a tort but is the choice of one of two alternative remedies. In many cases the action of assumpsit is based primarily upon the fact that a tort was committed. In *Orozem v. McNeill,* supra, it was said:

". . . It is often said that the person aggrieved may waive the tort and sue upon the implied contract, but this expression is open to some misapprehension. What he waives is the right to seek relief through a procedure peculiar to actions founded on tort. Having the privilege of pursuing either remedy, he elects to declare upon an implied contract instead of upon the tort. He does not waive the wrong or fraud that has been practiced upon him by which the defendant has obtained his money or property, but he alleges in effect that because it was so unlawfully obtained from him a promise to restore it is implied.

" 'The tort is, however, waived only in the sense that a party having a right to sue in tort or assumpsit will not, after he has elected to sue in assumpsit, be

allowed to sue in tort. By such an election that which was before the election tortious does not cease to be so. In fact, when the assumpsit is brought, it is only by showing that the defendant did a tortious act that the plaintiff is able to recover. There being no contract between the parties, unless the defendant is guilty of some wrong the plaintiff can establish no cause of action against him.' (Keener on Quasi-contracts, 159.)

"According to this view, the circumstance that the plaintiff is required to prove the fraud or other tort in order to recover does not prevent the maintenance of his action as one upon an implied contract." (l. c. 431, 432.)

See, also, Woodward, The Law of Quasi-Contracts, § 272, (2), p. 439, and Professor Corbin's Articles, "Waiver of Tort and Suit on Assumpsit," 19 Yale Law Journal, p. 221, and "Quasi-Contractual Obligations," 21 Yale Law Journal, p. 533.

A "cause of action" is the wrong done, not the measure of compensation or character of the relief sought. (*Foster v. Humburg*, 180 Kan. 64, 67, 299 P. 2d 46.) When the pleader has stated the facts of his case, he will be entitled to recover thereon just what such facts authorize. (*Crabb v. Swindler, Administratrix*, 184 Kan. 501, 504, 337 P. 2d 986, and cases cited; *Vakas, Administratrix v. Collins*, 185 Kan. 103, 107, 340 P. 2d 99; *Wycoff v. Winona Feed & Grain Co.*, 187 Kan. 98, 103, 353 P. 2d 979.) Whether a cause of action is based on implied contract or tort is determined by the pleading (*Smith v. McCarthy*, 39 Kan. 308, 18 P. 204; *Dougherty v. Norlin*, 147 Kan. 565, 569, 78 P. 2d 65, and cases cited; *Crabb v. Swindler, Administratrix*, supra), but the petition need not state whether the action is based on implied contract or tort (*Akin v. Davis*, 11 Kan. 580; *Cockrell v. Henderson*, 81 Kan. 335, 337, 105 P. 443) and where doubt exists whether the action is based on tort or implied contract, words appropriate to a tort action will be disregarded and the petition will be interpreted as counting in contract. (*State Highway Comm. v. Puskarich*, 148 Kan. 385, 391, 83 P. 2d 131; *Crabb v. Swindler, Administratrix*, supra, p. 507; *Kipp v. Carlson*, 148 Kan. 657, 661, 84 P. 2d 899; *Dougherty v. Norlin*, supra.)

When the allegations of the first cause of action are given all favorable inferences to which they are entitled, we think they allege a wrongful appropriation by plaintiffs of defendant's property right under circumstances as would raise an obligation to pay for the value of its use. The defendant should be given whatever relief the facts entitle him to, even if he has misconceived their legal effect. (*Akin v. Davis*, supra; *Chase v. Railway Co.*, 70 Kan. 546, 79 P. 153; *Tire Co. v. Kirk*, 102 Kan. 418, 420, 170 P. 811.) By a liberal inter-

pretation of the allegations, the clear import of the cause of action is one to recover on quasi contract or unjust enrichment the value of benefits plaintiffs received by their wrongful seizure and detention of defendant's property. Such a construction is obviously in the interest of substantial justice. As previously indicated, the working papers had a value only in their use by either plaintiffs or defendant. Manifestly, that value must be determined by its value to the user, and the resulting benefit rule is applicable as a measure of recovery. A judgment in favor of the defendant on such basis would be a positive gain to him, yet it imposes no penalty upon plaintiffs, it would merely compel them to pay for the use of that which they had no right to appropriate. Although there are no allegations of the value of the use of the property in the first cause of action as here construed, they may be regarded as being covered by the statement that defendant had been damaged by plaintiffs' conduct in the sum of $135,909.50 (*Tire Co. v. Kirk*, supra), notwithstanding such amount includes the sum of $64,459.50, the total of damages alleged in the other causes of action. See, also, Sutherland, Damages, § 415; Sedgwick, Damages, 9th ed. § 1260.

Turning to that part of the order sustaining the second paragraph of the motion to strike, we are of the opinion the district court did not err in striking out the three items of damage in the amounts of $40,000, $25,000 and $6,450, respectively. Conclusions heretofore announced would permit defendant to offer evidence of the use and the extent of the use to which plaintiffs put the working papers to establish the benefits, if any, plaintiffs received as a result of such use. However, the three specific items of damage and corresponding allegations, standing alone, were not proper items upon which the district court might instruct the jury to assess damages against plaintiffs in the event it found for defendant. Two of the items were based upon statements made by plaintiffs of their need of the working papers, and the other item related to defendant's estimate of cost to re-audit plaintiffs' books in order to secure data and information reflected in his working papers. At most, evidence of those items would be admissible only to show the benefits, if any, plaintiffs received, to be considered by the jury together with all other evidence under proper instructions by the district court to determine the amount of restitution necessary to indemnify defendant for the loss alleged to have been sustained.

Defendant contends it was error to sustain paragraph 4 b of the

motion which struck out allegations in the second cause of action to recover "expenses and time" expended in pursuit of the working papers. He concedes in his brief such allegations were made only to recover attorney fees. We are of the opinion the district court did not err in sustaining paragraph 4 b of the motion. The general rule is that attorney fees and expenses of litigation, other than ordinary court costs, are not recoverable as an item of compensatory damage in the same or subsequent action and are not chargeable as costs against the defeated party, in the absence of a clear and specific statute authorizing such recovery. (*A. T. & S. F. Rld. Co. v. Stewart,* 55 Kan. 667, 672, 41 P. 961; *Myers v. Strauss,* 171 Kan. 91, 229 P. 2d 774; *Vonachen v. Pratt Glass Co.,* 172 Kan. 545, 241 P. 2d 775.) The question whether defendant can recover expenses in pursuit of the property and for attorney fees based upon allegations for punitive damages in the fourth cause of action is not before us.

Other points have been advanced, but in view of conclusions heretofore announced it is unnecessary to discuss and decide them.

As here modified the judgment of the district court is affirmed.

## APPENDIX

### "Exhibit A.

"1. Abstracts prepared by Defendant of Plaintiffs' Federal Income Tax Returns for the years 1949 to 1954, inclusive.

"2. Working papers containing analysis and memoranda developed and prepared by Defendant of cash receipts and disbursements for Plaintiff, Frank J. Ablah, for the years 1949 to 1954, inclusive.

"3. Working papers containing analysis and memoranda developed and prepared by Defendant of personal loans made by Plaintiff, Frank J. Ablah, for the years 1949 to 1954, inclusive.

"4. Working papers containing trial balances of the general ledger, analysis of accounts in the general ledger and memoranda developed and prepared by Defendant of Plaintiff, Ablah Building Company, a partnership, for the years 1949 to 1954, inclusive (Ablah Building Company sometimes captioned as Ablah Hotel Supply Company).

"5. Detail of real estate lots for Plaintiff, Ablah Hotel Supply Company, a partnership, for the years 1949 to 1954, inclusive, furnished the Defendant by this Plaintiff.

"6. Working papers containing trial balances of the general ledger, analysis of accounts in the general ledger and memoranda developed and prepared by Defendant of Plaintiff, Ablah Hotel Supply Company, Inc., for the years 1949 to 1954, inclusive.

"7. Working papers containing analysis of transactions and memoranda developed and prepared by Defendant for Plaintiff, Ablah Manufacturing Company, a partnership, for the years 1949 to 1954, inclusive.

"8. Working papers containing analysis of transactions and memoranda developed and prepared by Defendant for Plaintiff, Ablah Meadows, for the years 1951 to 1954, inclusive.

"9. Work sheets and working papers developed and prepared by Defendant containing data and memoranda and allocation of proposed adjustments to each Plaintiff's taxable income reported on income tax returns previously filed by them for the years 1949 to 1954, inclusive.

"10. Defendant's copy of Final Report submitted to both Plaintiffs and the Internal Revenue Service, Kansas District, and prepared by Defendant.

"11. Miscellaneous correspondence and memoranda developed and prepared by Defendant or received in connection with Defendant's audit."