June Marie CORRIGAN, Appellant,

v.

ARMSTRONG, TEASDALE, SCHLAF-LY, DAVIS & DICUS, et al., Respondents.

No. 59165.

Missouri Court of Appeals,
Eastern District,
Division Four.

Jan. 7, 1992.

Motion for Rehearing and/or Transfer to Supreme Court Denied Feb. 10, 1992.

Application to Transfer Denied
March 24, 1992.

John S. Sandberg, St. Louis, for appellant.

Robert S. Allen and Davis Lynn Coffman, St. Louis, for respondents.

SATZ, Judge.

This is an appeal from the trial court's dismissal of plaintiff's petition. Plaintiff, Mrs. June Marie Corrigan, is the widow of Mr. Thomas J. Corrigan, Sr., who, until his death, was a client of the defendant law firm, Armstrong, Teasdale, Schlafly, Davis & Dicus (Armstrong). In her petition, Mrs. Corrigan seeks the delivery by Armstrong of "all documents ... relating to" Armstrong's representation of Mr. Corrigan. The trial court granted Armstrong's motion to dismiss Mrs. Corrigan's petition for failure to state a claim. Mrs. Corrigan appeals. We affirm.

Mrs. Corrigan contends the documents in question are "tangible personal property" which Mr. Corrigan owned and which he bequeathed to her as part of his express bequest to her of "all of [his] tangible personal property, such as but not limited to jewelry, clothing, automobiles, furniture, furnishings, books and pictures...." (See Appendix I). In her petition, she seeks an order of delivery of the documents in two alternative counts: Count I, an action in replevin; and Count II, an action for mandatory injunction. Stripping her petition to its essentials, she alleges the following facts.

Armstrong represented Mr. Corrigan individually until his death in 1985. It also represented the various businesses he "operated" during his lifetime, and it continued to do so until 1990. Among the services it performed were "the handling of [Mr. Corrigan's] Estate ... the establishment of various trusts in reference to ... the Estate and the Corrigan Companies ('Corrigan Trusts'), and services in relation to the Corrigan Family finances and ownership of the Corrigan Companies,...." "As a result of ... [this] representation, Armstrong ... has acquired or produced various property, documents and files...."

The "Corrigan Family, the Corrigan Companies and the Corrigan Trusts terminated their relationship with Armstrong" in 1990. They have requested Armstrong to "return all files subject to [its] control" in its representation of any of them, and they and Mrs. Corrigan have executed the necessary formal releases. Armstrong "has returned certain documents to which [Mrs. Corrigan] is entitled ... [but] still refuses to turn over other documents, including documents relating to what [Armstrong] call[s] the 'personal files' of [Mr. Corrigan]." "[T]here is a danger [this] property ... will be lost, damaged or destroyed", and "any further delay in obtaining access to these legal files may cause irreparable damage to the interests of [Mrs. Corrigan], ..., particularly in regard to any potential malpractice claims which might only be ascertainable through a review of these files."

In Mr. Corrigan's will, attached to the petition, he named two of his children as his personal representatives to administer his Estate; his Estate has been probated and closed; and, although Mrs. Corrigan does not allege the documents she seeks were either inventoried or distributed as part of Mr. Corrigan's Estate, she alleges

she "has received the right to all [of his] tangible personal property" by specific bequest in his will.

In each of her alternative prayers for relief, she requests an order directing Armstrong to deliver to her

all documents, including but not limited to, files, notes, correspondence and billings, whether generated or received by [Armstrong], and whether or not previously produced to [Mrs. Corrigan] relating to the legal representation by [Armstrong] of, or for the benefit of, [Mrs. Corrigan or Mr. Corrigan], including [Mr. Corrigan's] personal files.

Armstrong made a number of different arguments to the trial court in support of its motion to dismiss. The court found that if Mr. Corrigan had a "possessory interest in his legal files, he did not intend to exercise his interest and did not intend to pass possession of this interest to any third party." Any possessory interest in the legal files Mr. Corrigan may have had, the court said, "may have passed to the personal representative of his estate", but, this interest, "to the extent it existed, expired", the court said, "when the estate was closed." (See Appendix II) Accordingly, the court granted Armstrong's motion to dismiss.

We agree with the result reached and the action taken by the trial court, but we do so for different reasons. On appeal, our primary concern is the correctness of the result, not the route taken to reach it. *Maryland Plaza Redevelopment v. Greenberg*, 594 S.W.2d 284, 286 (Mo.App.1979).

### Documents In Issue

In her petition, Mrs. Corrigan does not specifically describe the documents she now seeks. She simply contends she is entitled to all documents generated by Armstrong's representation of Mr. Corrigan individually and in his various business capacities; and, thus, her request for delivery, as written in her petition, is an undefined request which may range from the rough notes of Armstrong to finished, final documents, including memoranda of law, inter-office communications, letters and the like which may or may not be necessary to an understanding of the final documents.

But, both parties expressly agree that Armstrong has delivered "certain documents" to Mrs. Corrigan, and, although these documents are also not specifically described, both parties tacitly agree that these delivered documents included final documents, such as wills, trusts and contracts, which Mr. Corrigan, in one of his capacities during his lifetime, apparently requested to be prepared. Therefore, for our purposes here, we construe Mrs. Corrigan's petition as not requesting delivery of these final documents.

### Mrs. Corrigan's Argument

Mrs. Corrigan contends that Mr. Corrigan, during his lifetime, acquired "ownership" of the documents in question. She bases this contention on two grounds: (1) Mr. Corrigan hired Armstrong to represent him, and, as a client, he acquired "ownership" of the results of Armstrong's labor in his behalf, and (2) Armstrong's ethical duty to Mr. Corrigan would have required it to surrender the documents in question to him if their attorney/client relationship had terminated during his lifetime, and this duty is based upon the unarticulated premise that a client owns all the documents generated in the client's behalf.

These documents, Mrs. Corrigan contends, are "tangible personal property", i.e., "property which may be felt or touched; such property as may be seen, weighed, measured, and estimated by the physical senses", *Norris v. Norris*, 731 S.W.2d 844, 845 (Mo. banc 1987), and, conversely, she contends, they are not "intangible personal property", i.e., "property ... which has no intrinsic and marketable value, but is merely the representative or evidence of value, such as certificates of stock, bonds, promissory notes and franchises." *Id.* Therefore, she contends, as "tangible personal property" owned by Mr. Corrigan, the documents were bequeathed to her by his specific bequest to her of "all of his tangible personal property."

■ The keystone of Mrs. Corrigan's contention is the existence of Mr. Corrigan's "ownership" of the documents in question. We disagree that this "ownership" existed. At best, Mr. Corrigan, during his lifetime, may have acquired a right of access to the information in the documents. This right is not "property" in the traditional sense, and, if it can be characterized as a "property" right, it would be an intangible property right, not a tangible one.

### Case Law

Neither party has cited any case in which the court directly addressed the precise issue here. We have found none either. *See, Marco v. Sachs*, 109 N.Y.S.2d 224, 225 (N.Y.Sup.Ct.1951).

### Ownership Based on Shop– Right Doctrine

Mrs. Corrigan derives Mr. Corrigan's "ownership" of the documents from an analogy with the shop-right doctrine. Missouri courts, she contends, have "recognized that where a person or company is retained to undertake services, the result of the labor belongs to the employer or client." An employer under the shop-doctrine acquires the right to use an invention created by an employee during the course and scope of his employment, she notes. Likewise, she contends, a client, who hires an "attorney to do legal work and create [a] file on his behalf", should acquire a right to the "fruits of [his attorney's] labor" and a correlative duty should be imposed on the attorney "to disclose to his employer, the client, the fruits of his labor."

This is a false analogy. But, even if it were true, any right created here by analogy would not be tangible personal property.

The classic definition of the shop-right doctrine and the limits of its reach are set out in *United States v. Dubilier Condenser Corp.*, 289 U.S. 178, 53 S.Ct. 554, 77 L.Ed. 1114 (1933). The doctrine is simply an "application of equitable principles." *Id.* at 188, 53 S.Ct. at 558. The principles are applied when an employee creates an invention or trade secret, although not employed to do so. *Id.*

> [W]here a servant [employee], during his hours of employment, working with his master's [employer's] materials and appliances, conceives and perfects an invention for which he obtains a patent, he must accord his master [employer] a non-exclusive right to practice the invention. *Id; Dewey v. American Stair Glide Corp.*, 557 S.W.2d 643, 647 (Mo.App. 1977).

Since the employee uses his employer's "time, facilities and materials to attain a concrete result", the employer "is in equity entitled to use that which embodies his own property and to duplicate it as often" as he likes. *Id.* 289 U.S. at 188–189, 53 S.Ct. at 557–558. But, the employer "has no equity to demand a conveyance of the invention, which is the original conception of the employee alone, in which the employer had no part. This remains the property of him who conceived it...." *Id.* at 189, 53 S.Ct. at 558.

■ Thus, the "right" the employer acquires is more accurately described as a non-exclusive license or privilege to replicate the invention or trade secret, without payment for that license or privilege. *See, e.g., Hewett v. Samsonite Corp.*, 507 P.2d 1119, 1122 (Colo.App.1973); *Aetna—Standard Engineering Co. v. Rowland*, 343 Pa.Super. 64, 493 A.2d 1375, 1378 (1985). More important, the license is said to be a "naked license" to make and sell the invention, *Hapgood v. Hewitt*, 119 U.S. 226, 233, 7 S.Ct. 193, 197, 30 L.Ed. 369, 372 (1886), personal to the employer and, thus, neither assignable nor transferable, *see, e.g., Francklyn v. Guilford Packing Co.*, 695 F.2d 1158, 1163 (9th Cir.1983), although it has been held to pass to a corporate successor. *See, e.g., California Eastern Laboratories, Inc. v. Gould*, 896 F.2d, 400, 402 (9th Cir.1990) and cases cited therein.

The relationship of Mr. Corrigan to Armstrong, client to attorney, is qualitatively different than the employer to employee relationship contemplated by the shop-right doctrine. Mr. Corrigan employed Arm-

strong to produce documents and perform services. Mrs. Corrigan makes no allegation, however, that Armstrong used materials or facilities provided by Mr. Corrigan either to produce the final documents or to perform the legal services for which it may have been hired.

■ To be sure, the parties do not dispute that Mr. Corrigan or his personal representative has paid Armstrong for these final documents and services; nor can they sensibly dispute that Armstrong, as Mr. Corrigan's attorney, owed Mr. Corrigan the duties of an agent and of a fiduciary. *See, e.g. Schwarze v. May Dept. Stores*, 360 S.W.2d 336, 338 (Mo.App.1962). No equitable principle nor fiduciary duty, however, is needed to create or justify Mr. Corrigan's ownership of any final documents he requested and paid for. Legal principles do that. But, these final documents have been delivered. The remaining documents now being sought present a different issue.

■ As an agent and fiduciary of Mr. Corrigan, Armstrong owed him the duty "to be perfectly frank ..., to make full disclosure of all material facts, to strictly avoid misrepresentation ... and in all respects to act with the utmost good faith, fidelity and loyalty in the interest of [Mr. Corrigan]." *Groh v. Shelton*, 428 S.W.2d 911, 916 (Mo.App.1968). To be perfectly frank "and make a full disclosure", however, simply means that Armstrong had the duty to grant Mr. Corrigan access to the information in their files which he may have needed to interpret the documents he requested to be prepared or to otherwise provide access to the information in the files in order for him to understand the services they performed. Obviously, Mr. Corrigan had the correlative right of access to this information if needed to protect his interests.

But, this right is limited to the extent Mr. Corrigan needed to know and understand what had been done for him, no more no less. Mr. Corrigan's right, therefore, was a conditional right. He could enforce it only to the extent that he needed information. His need is not shown in this record before us.

■ This conditional right of access to information is not contemplated by the traditional concept of property and, thus, does not fit within the traditional definition of property. "Property", in its broader sense, does include all rights which are of value. Brown, *Personal Property* § 1.7 at 11 (3rd Ed.1975). And, arguably, this conditional right of access was of some "value" to Mr. Corrigan. But, the right would have had no exchange value nor any objective transferable value on an open market which is the "value" normally contemplated by property rights. *Id.* To the extent that Mr. Corrigan's right of access could be construed to be property, it would, at best, be intangible personal property rather than tangible personal property. *See, Norris, supra*, 731 S.W.2d at 845.

Admittedly, the information which Mr. Corrigan may have needed may have been reduced to paper, and paper is a physical object over which possession may be taken. But, it is not the paper being sought here. Mrs. Corrigan is not interested in the papers because they have some intrinsic or marketable value. Rather, she seeks to learn the ideas, opinions and impressions which may be reflected in Armstrong's notes, working papers, drafts, internal memoranda and the like.

■ Moreover, Mrs. Corrigan would not prevail in a straight line application of the shop-right doctrine to the alleged facts. Under that theory, Mr. Corrigan, as an employer, would have had a non-exclusive license or privilege to copies of the documents in question. But, as has been noted, this right would have been a personal right, neither transferable nor assignable, *see, e.g. Francklyn*, 695 F.2d 1158 and, therefore, could not have been bequeathed by Mr. Corrigan. At best, the right may have passed to Mr. Corrigan's personal representatives. *See, California Eastern Laboratories, Inc.*, 896 F.2d 400. His personal representatives, however, have probated and closed his Estate and, therefore, this "shop-right" would have been extinguished.

### Tangible Property Right Based on Ethical Duty

Mrs. Corrigan also contends that Armstrong had an ethical duty to surrender Mr. Corrigan's papers to him if either one had terminated their relationship, and, she argues, this duty is simply the correlative of Mr. Corrigan's ownership of or property rights to these papers. We disagree.

Our Supreme Court Rule 1.16 of Rule 4 requires an attorney, at the termination of his relationship with a client, to take steps to protect the client's interest, such as "surrendering papers and property to which the client is entitled...." The attorney, however, "may retain papers relating to the client to the extent permitted by other law."

Mrs. Corrigan reads the "other law" referred to in the last sentence as referring to the existence of a valid attorney's retaining lien under common law or statute. This lien permits an attorney to retain a client's property to secure any unpaid fees, *see, e.g. Orr v. Mutual Benefits Health & Accident Ass'n*, 207 S.W.2d 511, 515 (Mo.App.1947); and, as Mrs. Corrigan correctly notes, attorney's fees are not in issue here. She, then, cites several cases which hold an attorney violates an ethical duty if he fails to turn over files to the client following the termination of their relationship. *In re Lechner*, 715 S.W.2d 257 (Mo. banc 1986); *Kallen v. DeLug*, 157 Cal.App.3d 940, 203 Cal.Rptr. 879 (1984); *Academy of California Optometrists v. Superior Court*, 51 Cal.App.3d 999, 124 Cal.Rptr. 668 (1975).

In *Lechner*, the attorney was sanctioned because he refused to turn over the "file concerning the claims" of his former client. 715 S.W.2d at 257. And, in *Kallen*, the court, in addressing a fee-splitting arrangement, stated that an attorney breaches his ethical duties if he retains "a client's case files after discharge, ... an attorney's work product belongs absolutely to the client whether or not the attorney has been paid for his services." 203 Cal.Rptr. at 885. Similarly, in *California Optometrists*, the attorney was ordered to deliver to his former client all files, documents, papers in his possession relating to the representation, including the "extensive notes, papers, memoranda and communications collected during the five years of representation." 124 Cal.Rptr. at 671.

Mrs. Corrigan contends the California courts expressly premise the attorney's ethical duty to surrender all his files, including his "work product", on the client's ownership of those files, and, she contends, the client's ownership is the unarticulated premise supporting the sanctions imposed by our Supreme court in *Lechner*. Whether this premise or principle is articulated or unarticulated, however, its existence is neither explained or justified in these cited cases, nor in any case we have found. More important, this expansive premise or principle is not needed to support the ethical duty of an attorney to "surrender papers and property to which the client is entitled", at the termination of an attorney/client relationship.

Rule 1.16 of Rule 4 by itself is no help in determining the papers which must be surrendered to the client. Insofar as ownership is concerned, the Rule is a tautology. The client is "entitled" to the papers "to which he is entitled."

The purpose of the Rule, however, gives it meaning. The Rule is designed to protect a client's interest. It imposes a duty upon the attorney "to take steps to protect" a former client's interest. "Surrendering papers and property to which the client is entitled" is one example of a step an attorney must take to protect that interest. But, this duty "to surrender papers and property" need not be supported or justified by any property concepts.

Mr. Corrigan hired Armstrong to provide documents and to perform services. If Armstrong were simply an independent contractor who provided Mr. Corrigan with goods and professional services, Armstrong would "own" the documents in question here. *See, e.g. Ablah v. Eyman*, 188 Kan. 665, 365 P.2d 181 (1961); *Ipswich Mills v. Dillon*, 260 Mass. 453, 157 N.E. 604 (1927).

In *Ipswich,* the court characterized an accountant as an independent contractor and refused to order the accountant to surrender his working papers to his client. In holding the papers were the property of the accountant, the court stated:

> The worksheets, as defined by the trial judge, were the defendant's property. They were made by them while engaged in their own business. The paper on which the computations were made belonged to them. They were not employed to make these sheets. The sheets were merely the means by which the work for which the defendants were employed might be accomplished. The title to the worksheets remained in the defendants after the computations were made. *Id.* 157 N.E. at 606.

Likewise, in *Ablah,* a replevin action brought by a former client to obtain delivery of an accountant's working papers, the court described the ownership of the working papers by an analogy to an attorney's work product:

> There is a close analogy between the rough notes collected by an attorney and the working papers prepared by an accountant. An attorney collects preliminary rough notes and uses those memoranda as raw material for the preparation of briefs, pleadings, and other legal documents. An accountant, on the other hand, places his preliminary data on working papers and then uses them as the basis for financial statements, audit certificates, and other accounting reports to his clients. Working papers, then, accomplish the same purpose for accountants that rough notes perform for attorneys. *Id.* 365 P.2d at 188.

██ Admittedly, an attorney hired by a client is not simply a contractor for documents and services, and certainly is not simply an independent contractor. He is, as Armstrong was here, an agent with the normal fiduciary duties imposed by law and with specific ethical duties imposed as a condition of the privilege to practice law. But, as we have previously demonstrated, Armstrong's fiduciary duties do not dictate Mr. Corrigan's ownership of the documents in question nor do they require Armstrong to surrender the documents. And, Armstrong's ethical duty does not require that surrender.

"The Rules of Professional Conduct are rules of reason. They should be interpreted with reference to the purposes of legal representation and of the law itself." Preamble: A Lawyer's Responsibilities, Rule 4.

The termination of an attorney/client relationship creates tension between protecting the interests of the client and protecting the interests of the attorney in the work product he creates. Without regard to property rights, the attorney must be required to turn over to his client any documents for which the client has bargained and paid. This simply is an obvious requirement to protect the interests of the client. Moreover, there should be no question that the client has a right of access to the attorney's work product for information needed to understand those documents. Likewise, if the attorney is hired to represent the client in processing or defending a claim, the client at a minimum must be entitled to those papers required by law to be filed in an appropriate tribunal and those related papers essential or necessary to make the former papers meaningful. These may include pleadings, depositions, interrogatories and the like.

This protection of the client's interests, however, is satisfied simply by imposing a duty upon the attorney to surrender copies of those papers containing information needed by the client to protect his interests. This duty is created by the ethical imperatives of the practice of law, and it may even have a counterpart in a legal duty. But, the client's correlative right to the attorney's performance of his ethical duty need not be and is not a property right. What the client needs is information in the files. He should be granted the right to satisfy that need to the extent he justifies it. That justification of need can be manifested in and processed by a request for mandatory injunction. Replevin and its prerequisite of a right to possession is not necessary.

The only ostensibly justified need here, however, is the stated need to determine whether a malpractice action may exist. Neither ethics nor legal process should be used as the vehicle to satisfy that need.

A number of other grounds have been argued by Armstrong to support the trial court's dismissal. We have not addressed their merits. We have chosen to resolve the issues on the grounds discussed.

Judgment affirmed.

SMITH, P.J., and CARL R. GAERTNER, C.J. concur.

### APPENDIX I

*Mr. Corrigan's Bequest*

.   .   .   .   .

I give, devise and bequeath all of my tangible personal property, such as but not limited to jewelry, clothing, automobiles, furniture, furnishings, books and pictures to my wife, JUNE MARIE CORRIGAN, if she survives me; if not, said property shall pass to my children who survive me, in as nearly equal shares as possible.

### APPENDIX II

*Trial Court's Judgment*

.   .   .   .   .

The parties agreed that if Mrs. Corrigan is entitled to the legal files of her deceased husband, it is because they pass to her through her husband's Will. The Court holds that the legal files of Thomas J. Corrigan, Sr. did not pass through the Will. Mr. Corrigan bequeathed to his wife his personal possessions such as furniture, books and pictures, all of which he was possessed at the time of his demise. While he may have had a possessory interest in his legal files, he did not intend to exercise his interest and did not intend to pass possession of this interest to any third party. Mr. Corrigan's possessory interest in his legal files may have passed to the personal representative of his estate to be exercised during the pendency of that estate. But such possessory interest, to the extent it existed, expired when the estate was closed.