Charles C. BLOSSOM, et al., Plaintiffs,

v.

BOYLE INVESTMENT COMPANY, et al., Defendants.

No. 87–0360C(6).

United States District Court,
E.D. Missouri.

Aug. 12, 1987.

Gallop, Johnson & Neuman, David T. Hamilton, Charles A. Seigel, St. Louis, Mo., Stephen L. Kennedy, St. Charles, Mo., for plaintiffs.

Lewis & Rice, John J. Gazzoli, Daniel E. Claggett, St. Louis, Mo., for defendants.

## MEMORANDUM OPINION

GUNN, District Judge.

Plaintiffs Charles C. Blossom and Marian E. Blossom (the Blossoms) bring this declaratory judgment action pursuant to 28 U.S.C. § 2201 seeking a declaration of rights under a lease governing the operation of the Central Utility System at the Mark Twain Shopping Center (the Center) in St. Charles, Missouri. Defendants counterclaim for replevin, conversion, assumpsit, breach of contract and tortious interference with contract.

The Court entered an order negotiated and drafted by the parties granting the right to operate and make repairs on the Central Utility System to defendants-counterclaimants pending hearing on the merits of the action. The order remains in effect. The Court also entered an order severing the determination of liability under the lease from a hearing on damage issues. Having considered the pleadings, the testimony and evidence presented by the parties at hearing, and the applicable law, the Court now declares plaintiffs in default under the lease and enters judgment for defendants on the complaint. The Court makes the following findings of fact and conclusions of law as required by Rule 52, Fed.R.Civ.Pro.

## FINDINGS OF FACT

Jurisdiction over this declaratory judgment action is founded upon 28 U.S.C. §§ 1332 and 2201. Plaintiffs Charles C. and Marian E. Blossom are citizens of the State of Missouri. Defendant Boyle Investment Company (Boyle) is a Tennessee corporation with its principal place of business in Memphis, Tennessee. Boyle is the sole general partner of a Tennessee limited partnership known as Boyle St. Louis Associates, Ltd. Defendant Frank Pridgen, Jr. is a citizen of the State of Georgia. Defendant Mark R. Loyd is a citizen of the State of Arkansas. Defendants Pridgen and Loyd are the partners of Pridgen Associates, a Georgia partnership. All defendants, by and through their respective partnerships, are doing business in the State of Missouri as PABC Missouri Associates (PABC) and will hereafter be collectively referred to as PABC.

Mark Twain Shopping Center, Inc. (MTSC) constructed the Center in St. Charles in 1968. Heating and air conditioning were provided by a "total energy plant" (the Plant) operated by employees of Laclede Gas Company until 1980, when MTSC sold the Center to Mark Twain Shopping Associates (Associates), a California limited partnership. The sale agreement (the Sale Agreement) between Associates and MTSC provided that MTSC would continue to operate the Plant, and to that purpose on April 1, 1980 Associates as lessor and MTSC as lessee executed the Central Utility System Lease (the Lease) at issue in this action. The Blossoms at that time personally or through their employees undertook to operate the Central Utility System on behalf of MTSC. MTSC has since dissolved, and its rights under the Lease have been assigned to the Blossoms.

The Lease, which has a twenty-year term, covers

"all of that equipment for the production and delivery of heated and chilled water for heating and air conditioning...."

Paragraph 6 of the Lease provides:

"During the term of this Lease, Lessee shall supply heated and chilled water for air conditioning those premises ... sufficient to maintain said premises at normal comfort temperatures ... using reasonable care and efforts in Lessee's performance hereunder. ... The heating and air conditioning to be supplied pursuant hereto is heating and air conditioning of the ambient air."

Paragraph 7 provides that tenants of the Center "for whom Lessee furnishes heat and air conditioning pursuant to this Lease" shall make payment for such services to Lessee. Paragraph 9 provides for payment by Lessor to Lessee for heating and air conditioning of the common areas of the Center.

After execution of the Lease in April 1980 the Blossoms engaged the services of Charles J.R. McClure & Associates, Consulting Engineers (McClure), to make rec-

ommendations to improve the Central Utility System with the view to increasing profits. Subsequent to McClure's evaluation, the Blossoms "mothballed" the Plant's original two 450–ton gas absorption chillers and replaced them with a single 550–ton electric centrifugal chiller.

In October 1980 Associates sold the Center to Jerome and Barbara Meislin and Robert and Linda Banovac, who in turn sold the Center to PABC in October 1985.

Since 1983, and possibly before, tenants at the Center have complained about the heating, ventilation and air conditioning (HVAC) services being provided by plaintiffs. The majority of the complaints, evidenced in responses to tenant surveys conducted by PABC management and through direct testimony at trial, concerned inadequate air conditioning at the Center. The evidence tended to establish that temperatures in certain stores at the Center ranged from 83°–96° both summer and winter. The complaints continued at least until the time of the hearing.

In 1983, as a consequence of tenant complaints, a dispute arose over the Blossoms' obligations under the Lease, and a declaratory judgment suit was filed on behalf of the former owners against the Blossoms to resolve it. The dispute—identical to that now before the Court—centered on whether the Blossoms' obligation under the Lease was limited to providing heated and chilled water through the Central Utility System or whether it extended to assuring that the air handlers and duct work in the Center were maintained and that adequate air conditioning in fact reached tenants in their stores. The 1983 declaratory judgment action was resolved in relevant part with the execution of a letter amendment on March 8, 1984 by Charles Blossom and landlord representative Ron Sabin in which the landlord agreed to pay the costs of repairing an air handler unit in a tenant space on a one-time basis.

Several of the tenants at the Center have undertaken responsibility pursuant to their leases with the landlord for maintenance of the air handling equipment delivering heating and air conditioning to their premises.

Neither the Lease nor the 1984 amendment letter provides in express terms who bears responsibility for maintaining air handling equipment not covered by such a tenant lease provision.

Prior to closing on its purchase of the Center in 1985 PABC through defendant Pridgen reviewed the Lease documents and the history of the 1983 dispute and its settlement. Both Pridgen and his manager, Amy Kennedy, testified that PABC was aware of tenant dissatisfaction with the HVAC prior to closing, but that it was unaware of its magnitude until a party for tenants of the Center shortly after closing. Thereafter, PABC conducted a formal tenant survey, which revealed substantial dissatisfaction with the HVAC services at the Center.

In November 1985 Pridgen met with Charles Blossom to discuss his obligation of performance under the Lease. Negotiations for purchase of the Blossoms' leasehold ensued, but the parties failed to reach an agreement and abandoned negotiations in late 1986. Tenant complaints continued throughout this period, and after negotiations broke down, Pridgen and a representative of defendant Boyle again notified Mr. Blossom of their expectations of performance.

On February 19, 1987 PABC served plaintiffs with written notice of default pursuant to ¶ 12 of the Lease. In its letter PABC specified deficiencies in the HVAC service, including inadequate air conditioning tonnage, deviation from a four-pipe water distribution system, modified or disabled controls and general system neglect. On February 24 the parties met to discuss the default notice. Mr. Blossom agreed to restore the four-pipe system and to reconnect the mall corridor air supply duct work but did not commit himself with respect to PABC's other claimed deficiencies.

On March 3rd plaintiffs filed this declaratory judgment action. They have taken no other action with respect to the default notice other than having a maintenance contractor, Johnson Controls, inspect the HVAC system. The report of Johnson

Controls affirms many of PABC's allegations of deficiency in the system.

On April 1, 1987 representatives of PABC inspected the HVAC system and determined that plaintiffs had not attempted to make repairs or modifications responsive to the notice of default. Brent Parry, who operated the system for the Blossoms, told the PABC representative that no such repairs or modifications had been made. Defendants then served the Blossoms with written notice of termination pursuant to ¶ 13 of the Lease.

## CONCLUSIONS OF LAW

■ As a preliminary matter plaintiffs have challenged PABC's status as assignee of Lessor's rights under the Lease. PABC presented the Court with the necessary conveyances and assignments to establish its status as Lessor. Furthermore, plaintiffs have since October 1985 dealt with defendants as Landlord and party to the Lease and are accordingly estopped from challenging the succession in interests. *Baum Associates, Inc. v. Society Brand Hat Co.,* 340 F.Supp. 1158, 1159 (E.D.Mo. 1972), *aff'd,* 477 F.2d 255 (8th Cir.1973).

Defendants established conclusively that temperature levels at the Center do not meet the Lease requirement of "normal comfort temperatures." Rather than challenging defendants' proof on this point, plaintiffs argue that the deficient temperatures are not attributable to any failure of performance on their part under the Lease. Plaintiffs argue that their sole obligation under the lease is to provide "heated and chilled water" to the air handling equipment, that they have performed this obligation, and that the inadequate air conditioning in the Center is attributable to problems with the air handling equipment and duct work, for which they bear no responsibility.

PABC contends that plaintiffs' obligation is to provide "normal comfort temperatures of the ambient air" and that the Lease imposes upon plaintiffs the duty to operate the HVAC system to fulfill the Landlord's obligation under the tenant leases to provide "comfort heating and air conditioning"

to the tenants. The Court finds defendants' interpretation of the Lease to be the reasonable construction of its terms and accordingly holds that plaintiffs' obligations under the Lease do not end with the provision of heated and chilled water. Even were the Court to adopt plaintiffs' interpretation, the credible evidence at the hearing established that the electrical centrifugal chiller currently in use by plaintiffs is inadequate to cool water sufficient for maintenance of normal comfort temperatures and has not been maintained adequately to achieve performance of the Lease requirements.

■ Under Missouri law, a court may consider extrinsic evidence that will assist in clarifying the nature of contractual obligations. *Hardesty v. Mr. Cribbin's Old House, Inc.,* 679 S.W.2d 343, 346 (Mo.App. 1984). In the present case, the Court finds that the Lease cannot be construed out of context of either the Sale Agreement for the Center or the leases between PABC as landlord and the tenants of the Center. Mr. Blossom testified that when Associates purchased the Center in 1980 it expressed its unwillingness to engage in operation of the unique HVAC system, which led to plaintiffs' initial agreement under the Lease to operate the system for the landlord. The Sale Agreement and the Lease were negotiated contemporaneously and should be construed together.

■ The Lease does not by its terms limit plaintiffs' obligation to the supply of heated and chilled water but specifies that "heating and air conditioning" are to be supplied pursuant to the Lease (Lease ¶ 6, *supra*). In essence, the reasonable construction of the Lease, clarified by the circumstances of its execution and construed in coordination with the Sale Agreement, is that Associates, aware that it would have to provide temperature control services to tenants of the Center but unwilling to undertake operation and maintenance of an unfamiliar Central Utility System, subcontracted with Mr. Blossom to provide necessary heating and cooling services to those tenants. This construction is supported by Lease terms providing that Lessee would

have authority to establish rates for service and collect revenues from the tenants and that Lessor would have no responsibility for operation or maintenance of the system. Paragraph 9 expressly refers to the furnishing by Lessee of "heat and air conditioning pursuant to [the] Lease."

The 1984 letter amendment reaffirms rather than undermines this interpretation. It further clarifies plaintiffs' obligation: "The heating and air conditioning service to be provided by us shall be such as will maintain normal comfort temperatures of the ambient air in the tenant-occupied space and common areas of the shopping center." The caveat in the following sentence, "... provided the air handlers are in good working order and properly maintained," may reasonably be construed to refer to air handlers for which tenants have expressly undertaken responsibility pursuant to tenant leases.

The following syllogism serves as guidepost to the logical interpretation of the Lease: The centralized nature of the HVAC system dictates centralized control. The Blossoms receive all HVAC revenues from the tenants at the Center. Only plaintiffs can assure comfort temperatures in the Center. The Court therefore concludes that the Lease obligates them to do so.

Even were the Court to interpret the Lease as imposing the limited obligation on plaintiffs of providing heated and chilled water, the Court holds that plaintiffs have failed to meet this obligation. The evidence at the hearing established that the 550–ton chiller currently in use does not have the capacity to remove heat from water to cool the center on a typical summer day in St. Louis, when temperatures rise above 90°. Defendants' expert testified on the basis of an analysis of water temperature differentials in the cooling system, measurement of interior space temperatures, a load analysis and approximately forty hours observation of the system that the 550–ton chiller was overloaded. Plaintiffs' experts agreed that the system design load was at least 900 tons and that peak temperatures would require operation of an additional chiller as a backup. The experts agree that one of the original 450–ton absorption chillers is inoperable and the evidence establishes that the other has not been tested for years. The piping connections on both have been dismantled. Concisely stated, plaintiffs are not prepared to call the absorption chillers into service in order to assure compliance with even minimal obligations under the Lease.

Plaintiffs argue that PABC's predecessors agreed pursuant to the 1984 letter amendment to the replacement of the 450–ton absorption chillers with the 550–ton chiller. However, the amendment expressly provides that the 550–ton chiller is not a "replacement" and that the absorption chillers would remain installed. Again, it would be unreasonable to read this provision accepting plaintiffs' installation of an assertedly more efficient chiller as an agreement to relieve plaintiffs of the obligation of assuring adequate cooling capacity from the system.

■ There was conflicting testimony at trial about whether a four-pipe or a two-pipe water distribution system would provide superior service at the Center. Nonetheless, ¶ 10 of the Lease requires maintenance of a four-pipe system, and plaintiffs have failed to restore such a system even after making assurances to defendants that they would do so. This places plaintiffs in default under the Lease.

Plaintiffs' expert challenged the method of analysis of the HVAC system deficiencies undertaken by defendants. However, it is significant that this expert had been employed by plaintiffs for six years and had never undertaken an analysis of the system in the face of multiple complaints from landlords and tenants about service during that period.

■ PABC correctly followed the default and termination provisions of the Lease. Plaintiffs received reasonable notice to commence actions to cure, and an April 1, 1987 termination date was reasonable in view of impending summer weather. The notice was specific, and PABC met with Mr. Blossom to discuss the notice shortly after its receipt. Having complied with the

contractual default and termination provisions, PABC properly terminated plaintiffs' contract.[1] *Denney v. Traders National Bank of Kansas City*, 408 S.W.2d 71 (Mo. 1966); *Spencer's River Roads Bowling Lanes, Inc. v. Unico Management Co.*, 615 S.W.2d 121, 125 (Mo.App.1981).

 PABC's earlier conduct with respect to the Blossoms does not constitute a waiver of termination rights under the Lease. PABC has never accepted the Blossoms' failure of performance. Immediately upon taking over the Lessor's rights under the Lease PABC notified the Blossoms of its dissatisfaction with the HVAC system service and of its insistence that the Blossoms remedy deficiencies in service. Plaintiffs did not demonstrate either that PABC's prior conduct was inconsistent with its present claim or that plaintiffs relied on that conduct to their detriment. *See Southgate Bank & Trust Co. v. May*, 696 S.W.2d 515, 520 (Mo.App.1985).

The Court accordingly enters judgment in favor of defendants. Plaintiffs were in material breach of their contract obligations under either party's interpretation of the Lease, and PABC acted properly in terminating the Lease.

---

**1.** Plaintiffs' argument that the Lease may only be terminated upon their total failure to provide services is unreasonable. The Lease obligates plaintiffs to provide "normal comfort temperatures." Plaintiffs' interpretation would require

PABC to accept nonconforming performance, would defeat the purpose of the Lease and would, as a practical matter, nullify the default and termination provisions of the Lease.