E. Jerry **HARDESTY** and Joseph L. **Johnson d/b/a Heritage Investment Co.,** Appellants,

v.

**MR. CRIBBINS'S OLD HOUSE, INC.,** Respondent.

**No. 46524.**

Missouri Court of Appeals, Eastern District, Division Four.

Aug. 21, 1984.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 16, 1984.

Application to Transfer Denied Nov. 20, 1984.

David G. Dempsey, Clayton, for appellants.

Paul Brackman, Clayton, for respondent.

STEPHAN, Judge.

Plaintiffs, Jerry Hardesty and Joseph Johnson, d/b/a Heritage Investment Co. (hereinafter referred to as Heritage) appeal from a judgment in favor of defendant Cribbin's Old House, Inc. (Cribbin's) on its counterclaim in which the trial court granted Cribbin's exclusive rights in the parking lot as originally constructed and damages on its claim for conversion of personal property in the amount of $300 actual and $3,000 punitive. We affirm in part and reverse in part.

Heritage, a commercial land development company and landlord herein, and Cribbin's, a restaurant, entered into a long-term commercial lease of certain premises consisting of an existing restaurant building and an adjacent 147 space parking lot in St. Charles County. After extensive renovations of a house which was to serve as the restaurant and construction of the parking lot, Cribbin's restaurant opened in February 1980. In March 1980, Heritage began construction of a commercial complex known as the Marketplace, containing commercial and retail businesses, on the property next to Cribbin's leased premises. The original parking lot was also expanded so as to accommodate more than three hundred automobiles. In February 1981, Classic Carriage & Car, a restaurant, opened in the Marketplace. Plaintiff Joseph L. Johnson owned the new restaurant in partnership with two of his sons. Prior to its opening, Heritage took eight spaces from the parking lot leased to Cribbin's in order to expand a planting island and provide an entrance way in front of Classic Car.

Due to the popularity of certain promotions of Classic Car, the parking lot leased to Cribbin's became very congested. In response to the parking problem, Harry Hilleary, president of Cribbin's, notified Heritage by letter on February 25, 1981, that the use of the parking lot by employees and customers of Classic Car, as well as the taking of the eight parking spaces, violated the terms of the lease. Cribbin's also informed Heritage of its intention to rope off its parking lot in order to reserve it for its customers. On February 26, 1981, Cribbin's barricaded portions of the parking lot and erected signs restricting use of its leased parking lot to Cribbin's customers only. The barricades and signs were soon removed by employees of Classic Car.

On Friday, March 6, 1981, Cribbin's caused the barricades and signs to be put up again despite Heritage's notice to Cribbin's that such actions were violations of the lease. The following day, an employee of Heritage removed the barricades and signs from the parking lot. The barriers, which were valued at approximately $96.00, were not returned to Cribbin's.

Heritage filed a petition for permanent injunction to: (1) enjoin Cribbin's from obstructing the parking lot, and (2) enjoin Cribbin's from using certain advertising signs on the leased premises which were allegedly erected without Heritage's approval. Cribbin's counterclaimed seeking: (1) a declaratory judgment as to Cribbin's rights to use of the parking lot; and (2) actual and punitive damages for conversion of the barriers.

In Heritage's first point it argues that, if the trial court had excluded inadmissible parol evidence, then there would be no substantial evidence to support its decree granting Cribbin's exclusive rights to use the original 147 space parking lot.

In support of its argument that the lease was not intended to be a grant of exclusive use of the parking lot to Cribbin's, Heritage relies on the following lease provision in Section 15.2 of the lease relating to "General Common Areas":

> ... The rights of the Tenant hereunder in and to the areas of this Article referred to shall at all times be subject to the rights of the Landlord and the other tenants of the landlord to use the same in common with the tenant, and it shall be the duty of the tenant to keep all of said areas free and clear of any obstructions created or permitted by the tenant....

Heritage urges that the plain and unambiguous language of this provision grants Cribbin's the right to use the parking lot in common with the Landlord and other tenants. It argues, therefore, that the court erred in admitting the following into evidence:

a) Cribbin's contribution to costs of the parking lot, and its payment of costs of paving overruns in construction;

b) Leases between Heritage and other Marketplace tenants regarding legal description of leased property, which did not make reference to "limited common areas;"

c) Opinion testimony of plaintiff Hardesty and Harry L. Hilleary on the definitions of Limited Common Areas and General Common Areas;

d) Hilleary's testimony of his expectations in negotiating the lease.

A reading of the transcript reveals that the basic dispute arose from a disagreement as to whether the Cribbin's parking lot, as originally constructed became a part of the "General Common Area" of the Marketplace complex as it was subsequently developed. In that connection, we note that Section 15.1 of the lease distinguishes between limited and general common areas:

"Limited Common Areas" shall mean that part of the Leased Premises exclusive of the restaurant building including Tenant's parking lot and the lighting, sidewalks, and landscaping thereof. "General Common Areas" shall mean all sidewalks, loading and unloading areas, rear service area, facilities, equipment and special services that may hereafter from time to time be made available by Landlord for the use and benefit of one or more tenants of any commercial areas developed by Landlord as part of Heritage."

Although subsequent statements in that section reserve to the landlord the right to make changes in the general and limited common areas, the landlord is required to maintain the same number of parking spaces for the use of the tenant regardless of "relocation of parking spaces within the Limited Common Areas." By its silence on the subject, the lease does not impose the same requirement with respect to the general common areas.

■ Under the circumstances, it was proper to admit evidence of extrinsic facts and circumstances in order to clarify the nature of the agreement itself. As this court said in *Rufkahr Construction Company v. Weber*, 658 S.W.2d 489, 497 (Mo. App.1983), "admission of oral testimony for the purpose of interpreting the contract does not violate the parol evidence rule. Evidence of agreements or negotiation prior to or contemporaneous with the execution of written agreement are admissible to establish the meaning of the written contract." See also *Bryan v. Vaughn*, 579 S.W.2d 177, 181–182 (Mo.App.1979). The extrinsic evidence did not serve to change the terms of the contract, but merely to clarify them. It was properly admitted. Furthermore, from our examination of the lease in this court tried case, we cannot say that the trial court's interpretation of the lease was erroneous, i.e., that Cribbin's had the right to exclusive use of the original lot for customer parking, subject to the right of normal ingress and egress of other tenants.

■ In a closely related point, Heritage argues that the trial court erred in holding that Cribbin's has the right to the eight parking spaces in the original lot which Heritage blocked off with concrete barricades. The spaces are in front of the main entrance to the Classic Carriage & Car restaurant; and, when cars pulled into those places, their headlights would shine into the restaurant. Heritage bases its argument on the provisions of Section 15.1 of the lease, discussed above. The trial court found no merit in the argument, nor do we. Although that section of the lease allows the landlord to make changes in the limited common area, it imposes a corresponding duty on the landlord to maintain the same number of parking spaces for the tenant in that area or to construct additional parking spaces on "adjacent property

which spaces shall be as reasonably close as possible to the main entry" of Cribbin's restaurant. Although the later constructed Marketplace parking lot is adjacent to the original Cribbin's lot, there was no showing that any of the parking places on the Marketplace were to become part of the Cribbin's lot or that any of them were "as reasonably close as possible" to the Cribbin's entrance. Our examination of the diagrams placed in evidence confirms this conclusion, and we rule the point against Heritage.

In its next points, Heritage contends that the trial court erred in granting Cribbin's $300 actual and $3000 punitive damages for conversion of the signs and wooden barriers which it erected to delineate the Cribbin's parking area. As support for this argument, Heritage argues that no unauthorized taking of Cribbin's property occurred because the lease authorized it as landlord to remove the barriers. The provision in the lease upon which Heritage relies states as follows:

*Section 5.2 Signs, Awnings and Canopies*

... (b) Tenant shall not decorate, paint or in any manner alter, and shall not install or affix any device, fixture or attachment upon or to, the exterior of the Leased Premises, including the roof or canopy thereof without the prior written consent thereto of landlord and such approval shall not be unreasonably withheld. If the tenant shall do any of the foregoing acts in contravention of this provision Landlord shall have the right to remove any such decoration, paint, alteration, device, fixture or attachment and restore the Leased Premises to the condition thereof prior to such act ....

The barriers each consisted of three two by four inch pieces of lumber and were about three feet high. They were connected by lengths of clothesline. The signs bore the inscription "Mr. Cribbin's Parking Only" and were displayed in the vicinity of the barriers so as to reserve the Cribbin's limited common area for its customers' parking.

We find merit in appellant's claim that the trial court erred in awarding damages to the defendant on its counterclaim for conversion. To prevail on a claim for conversion, the party asserting it must show: a tortious taking, or use or appropriation to the use of the person in possession indicative of a claim of right in opposition to the rights of the owner, or a refusal to surrender possession to the owner on demand. *Knight v. M.H. Siegfried Real Estate, Inc.*, 647 S.W.2d 811, 814 (Mo.App. 1982); *Houston v. Columbia Federal Savings and Loan Association*, 569 S.W.2d 211, 214 (Mo.App.1978). In the instant case, there is no claim that Cribbin's had the plaintiff's consent, written or otherwise, to position the barricades on the parking lot. Thus, under the terms of Section 5.2(b) of the lease, the landlord had the right to remove them. The taking, therefore, was not tortious. There is a total absence of any evidence that Heritage made any use of the barricades after their removal, or that Cribbin's made any demand for their return, or that Heritage had refused to return them. Our examination of the record indicates that, although the fact of the taking was shown, neither of the related issues of use or refusal to return received any attention at the trial. Defendant Cribbin's failed to bear its burden of proof on its counterclaim for conversion. The judgment for actual and punitive damages for conversion is reversed.

In its final point, Heritage claims that the trial court erred in denying its request for an injunction requiring Cribbin's to remove a sign which bore the words "Cribbin's Old House" and, in smaller print, "good food." The sign was visible to traffic on nearby Highway 94. It had been erected, with the consent of Heritage, at the time the restaurant was opened. Smaller signs advertising "Sunday Brunch" and the restaurant's opening time were displayed beneath the principal sign. Approximately six months after Cribbin's opening, Mr. Hilleary received a letter from plaintiff Hardesty directing that the sign be removed within sixty days because it

had "lived out its usefulness." Hilleary caused the Sunday Brunch and other notices removed but refused to remove the principal sign because he believed it was necessary to maintain identification of the restaurant to highway traffic. In arguing that an injunction was appropriate, Heritage relies on Section 5.2(a) of the lease which states as follows:

Tenant shall not erect, install or maintain any signs or other advertising or display devices, illuminated or otherwise, on the exterior of the Leased Premises, which devices shall be visible to public view outside the Leased Premises, without the prior approval thereof in writing by Landlord and such approval shall not be unreasonably withheld. Tenant shall promptly, on written notice from Landlord, remove any sign or advertising or display device erected or maintained.

Mr. Hardesty admitted on direct examination that he had given oral approval for the erection of the sign but stated that the approval was only temporary and in connection with the opening of Cribbin's restaurant. Heritage contends that the letter to Hilleary demanding removal of the sign complied with Section 5.2(a) and that the continuing presence of the sign constitutes a violation of the lease. Based on Hardesty's opinion that the sign "has a very unpleasing look," Heritage also argues that its rejection of the sign could not be held unreasonable. Cribbin's position on the latter point, as pleaded in its return to the order to show cause and supported by the evidence at trial, is that plaintiffs have "unclean hands" in that they have allowed plaintiff Johnson's restaurant to erect large, illuminated signs and other advertising displays on the premises while opposing defendant's sign.

It is a well recognized rule that equity will not aid a party who comes into court with unclean hands. *Mahaffy v. City of Woodson Terrace,* 609 S.W.2d 233, 238 (Mo.App.1980). Furthermore, such conduct as will disqualify a party from equitable relief need not be fraudulent, but simply indicative of a lack of good faith in the

subject matter of the suit. *Moore v. Carter,* 201 S.W.2d 923, 929 (Mo.1947). Here, the landlord was demanding removal of Cribbin's sign (which the trial court could well have found wholly inoffensive from the photographs in evidence) while countenancing far more elaborate advertising displays by Cribbin's competitor, in which the landlord had a direct financial interest. This fact alone would warrant a finding of unclean hands. In view of the principles that "injunction is a harsh remedy, to be used sparingly and only in clear cases," *Neaf v. Mallory,* 622 S.W.2d 372, 373 (Mo. App.1981) and that injunctive relief does not issue as a matter of right but as an exercise of judicial discretion, *Hudson v. School District of Kansas City,* 578 S.W.2d 301, 311 (Mo.App.1979), we find no error in the trial court's denial of the injunction.

Affirmed in part; reversed in part.

GAERTNER, P.J., and SMITH, JJ., concur.