5 F.Supp.2d 1023 (1998)
CHRYSLER CORPORATION, Plaintiff,
v.
John J. CAREY, et al., Defendants.
No. 4:96CV591 CDP.
United States District Court, E.D. Missouri, Eastern Division.
May 26, 1998.
*1024 *1025 Ronald A. Norwood, Sr., Barry A. Short, Gary M. Smith, John E. Hall, Julia J. Lilly, Lewis and Rice, St. Louis, MO, Jacqueline Glassman, Chrysler Corp., Highland Park, MI, for Chrysler Corp.
Richard C. Wuestling, IV, Wuestling and James, St. Louis, MO, Louis J. Basso and Krup, Ballwin, MO, for John J. Carey, Joseph P. Danis, Carey & Danis, L.L.C.

MEMORANDUM AND ORDER
PERRY, District Judge.
This matter is before the Court on cross-motions for summary judgment filed by the parties in this case. This case pits plaintiff Chrysler Corporation against two attorneys who formerly worked at a law firm that represented Chrysler in defending various class action lawsuits involving alleged defects in certain Chrysler vehicles. While at this firm, both attorneys did a significant amount of work on several of these lawsuits. After leaving the firm, the two attorneys formed their own firm and agreed to serve as plaintiff's counsel in a putative class action against Chrysler, albeit involving an alleged defect different from the defects claimed to exist in the cases on which they had worked while at their former firm. Claiming that the conduct of the attorneys was not only unethical but also tortious, Chrysler filed the instant suit. The defendants are the two attorneys and their law firm. Because its claims are based entirely on Missouri law, Chrysler has invoked the court's diversity jurisdiction. In its second amended complaint,[1] Chrysler alleges breach of fiduciary duty/constructive fraud (count I), tampering with computer data in violation of a Missouri statute (count II), and breach of contract (count III). In count IV, Chrysler seeks injunctive relief against defendants. For the reasons set forth below, the Court will deny the motions *1026 of both plaintiff and defendants in all but one respect: the Court will enter summary judgment in favor of defendant Carey on Chrysler's breach of contract claim.

I. Facts[2]
Defendants John Carey and Joseph Danis[3] are former associates at the St. Louis law firm Thompson & Mitchell ("T & M") (now Thompson Coburn). They are both graduates of the St. Louis University Law School and members of the Missouri and Illinois bars. Carey worked at T & M from August 3, 1987, to January 13, 1995. Danis worked at T & M from August 1993 until January 14, 1995. During Carey and Danis' time at T & M, Charles Newman, then a senior partner with the firm, represented plaintiff Chrysler Motor Corporation as lead counsel on most of its product liability class action litigation. Under Newman's direction, Carey and Danis worked on the five Chrysler class action lawsuits described below.
Osley v. Chrysler Corp., No. 92-424-JPG (S.D.Ill.), was a class action suit in which the plaintiffs claimed that two Chrysler vehicle models, the Renault Alliance and Encore, had defective heater cores. Plaintiffs sought actual and punitive damages. In particular, plaintiffs demanded that Chrysler compensate them for the alleged diminution in value of their vehicles. In Osley, Carey, working under Newman's supervision, drafted motions and briefs, conducted discovery, and communicated frequently with Chrysler and with plaintiffs' attorneys. Specifically, his Osley-related work included researching the feasibility of removing the case from state to federal court, drafting a third-party complaint against the supplier, locating and identifying potential experts to testify regarding plaintiffs' damage claims, working on the opposition brief to the plaintiffs' class certification motion, and participating in discussions with Chrysler regarding class action defense issues and settlement strategy. In connection with the settlement of the case, Carey redrafted the plaintiffs' amended complaint in order to make it as broad as possible and thereby achieve the greatest res judicata effect. During his time at T & M, Carey billed 616 hours on the Osley matter. Danis's involvement in the case was much less significant. While a summer associate at T & M, he performed a limited amount of legal research on the case. Osley was settled on September 3, 1993.
Carey and Danis also worked on four state court class actions involving allegedly defective rear door latches in Chrysler minivans: Larpenteur v. Chrysler Corp., No. 44366 (18th Judicial Dist. La.), Peterson v. Chrysler Corp., No. CV-94-001377 (Cir. Ct. of Mobile County, Ala.), Drake v. Chrysler Corp., No. 94-0552 (Cir. Ct. of Harrison County, Tex.), and Mann v. Chrysler Corp., No. CV746017 (Sup.Ct. of Santa Clara County, Cal.) (collectively, the "Latch class actions"). The plaintiffs in these cases sought damages for the cost of remedying the claimed defect. In Drake and Mann, the plaintiffs also specifically sought diminution in value damages. Under Newman's direction, both Carey and Danis worked on these four cases at some time during 1994. Carey performed essentially the same type of work as he had in the Osley case. According to T & M's time records, Carey billed 188.6 hours on Larpenteur, 202.2 hours on Peterson, and 137.4 hours on Drake. Danis's tasks included performing research, writing briefs, and drafting discovery requests and responses. After Newman became dissatisfied with Danis's work ethic, he removed Danis from working further on Chrysler matters.
In connection with both Osley and the Latch class actions, regular exchanges of confidential information between Chrysler and T & M took place. During the period in which Carey and Danis worked on Chrysler matters, they had complete access to T & M's files pertaining to these cases and to the firm's local area network ("LAN"). The LAN contained drafts and final versions of pleadings, research, memoranda, and communications *1027 with Chrysler. The LAN also contained a gateway via which T & M and personnel in the office of Chrysler's general counsel could communicate by electronic mail.
During the time that they spent working on Chrysler's matters at T & M, Carey and, to a lesser extent, Danis frequently participated in conferences with Newman and Chrysler's in-house counsel regarding defense strategy. In a typical week, Carey would speak by telephone with Chrysler's lawyers several times. Carey and Danis toured Chrysler manufacturing facilities, met with Chrysler officials, and learned about Chrysler's organizational structure. However, while at T & M, neither Carey nor Danis did any work on a Chrysler class action in which the allegedly defective component was an anti-lock braking system.
Carey billed in excess of 1,100 hours to Chrysler matters during 1993 and 1994, his last two years at T & M. Approximately twenty-seven percent of his total billable hours were spent working on Chrysler cases. During 1994, Danis' only full year at T & M, he charged over 400 hours to Chrysler matters, or approximately twenty-three percent of his billable hours.
As T & M associates, Carey and Danis each signed written confidentiality agreements with T & M. Carey's agreement stated that T & M expected his "professional conduct to be guided by the highest standards of the legal profession." It further provided, "In carrying out matters assigned to you or in connection with matters that otherwise come to your attention as an associate of the firm, you shall maintain complete confidentiality." Danis's agreement, which he signed on August 16, 1993, shortly after arriving at the firm, was more formal. It provided, in relevant part:
Thompson & Mitchell represents its clients regarding matters which are sometimes quite complicated and sensitive. Even the slightest reference to such a matter could have a major adverse impact on the client and, in turn, the Firm.
. . . . .
A client's confidence is not expected to be shared with persons within the office who do not have a need to know nor anyone outside the office, including family members or friends.
To emphasize the importance of the Firm's position regarding this policy, you are asked to sign this statement indicating that ... you will treat all information confidentially during and after your association with the Firm.
In November 1994, Carey and Danis gave notice to T & M that they intended to resign from the firm. They left T & M in mid-January 1995. Before their departure, Carey and Danis each took with them copies of various pleadings and memoranda. Carey took fourteen Chrysler-related documents totaling 195 pages. Danis took sixty-six Chrysler-related documents totaling 801 pages. Some of these documents pertained to Chrysler cases on which Danis had done no work. For example, Danis took a copy of a memorandum opposing class certification filed by T & M in Jones v. Chrysler, a case brought against the company in the Eastern District of Missouri. The certificate of service attached to this memorandum is dated August 21, 1987. Danis also took two memoranda authored by Newman which are specifically labeled "Confidential and Privileged." One of these documents is a June 15, 1994, memorandum to "File" concerning the Drake case. Some of the documents taken by Danis were not in hard copy form, but were copied off of T & M's LAN. Danis obtained these latter documents by accessing that LAN and saving the documents onto floppy disks. Among the documents taken by Danis in this manner was the second amended complaint in Osley that Carey had drafted in connection with the settlement of that case. T & M's computer records show that Danis saved this document to his "home area" on or after December 19, 1994. Neither Carey nor Danis informed T & M that he was taking any of the aforementioned documents.
Shortly after leaving T & M, Carey and Danis formed the law firm of Carey & Danis, L.L.C. ("Carey & Danis"), which, as mentioned above, is also a defendant in this case. The firm shares office space with the law *1028 firm of Danis, Cooper, Cavanaugh & Hartweger, L.L.P. ("Danis, Cooper"). David Danis of Danis, Cooper is the father of Joseph Danis. Under an oral agreement, Carey & Danis pays Danis, Cooper for use of the space, secretarial and facsimile services, and general office supplies. The two firms use a single computer system. In a marketing brochure for their firm, Carey and Danis describe themselves as "uniquely qualified to represent consumers in class actions given [our] previous experience representing corporations in class actions while working for a large, prestigious Midwestern law firm."
On August 6, 1995, a lengthy article appeared in the St. Louis Post-Dispatch with the headline "Iffy Brakes Vex Chrysler: Some Owners Get Buyout Offers; Others Get $3,000 Repair Bills." The article described a National Highway Traffic Safety Administration ("NHTSA") investigation of anti-lock brake system ("ABS") failure in Chrysler cars and minivans. The article noted that NHTSA and others had compiled nearly 2,000 reports of such failures, and predicted that "the total number is certain to be much higher."
Shortly after the article appeared, Carey was contacted by Denis Beam, who had been referred by his sister-in-law, Ann McMahon, then a secretary at T & M. Beam had told McMahon that he was looking for an attorney to help him with either "a lemon law or class action suit of some type" against Chrysler. Beam owned a 1991 Dodge Caravan minivan, and claimed that he had been experiencing problems with the vehicle's ABS, including several failures, which his dealer had been unable to remedy. According to Carey, Beam told him "that, if possible, he would like to have the brakes fixed and receive some type of monetary compensation for his inconvenience, loss of use of the vehicle, and if the vehicle was worth less money than it was because of the defect." Carey told Beam that he had read the Post-Dispatch article and that the ABS case "could be ideally suited as a class action suit." He inquired whether Beam would be willing to serve as a plaintiff and a class representative in such a suit. According to Carey, Beam authorized Carey & Danis to file a lawsuit on his behalf against Chrysler. At that time, Carey anticipated that Carey & Danis and Danis, Cooper would prosecute the case.
Following his conversation with Beam, Carey did some research into whether Carey & Danis's representation of Beam would create a conflict of interest, given the work that Carey had done on Chrysler's behalf while a T & M associate. He concluded that it would not. However, for numerous reasons, he and Danis began to have second thoughts about whether their firm should get involved in the case: they were receiving referrals from T & M, had friends there, did not want to embarrass their old firm, and already had a heavy caseload. Also, they were concerned that Chrysler might file a motion to disqualify and that such a motion would affect their ability to represent the class.
Danis contacted Evan Buxner, a long-time friend, to see if Buxner's firm, Blumenfeld, Kaplan & Sandweiss, P.C. ("Blumenfeld"), would be interested in joining Carey & Danis and Danis, Cooper in the Beam litigation. Buxner raised the matter with John Young, the chairman of the Blumenfeld firm's litigation section. A lunch meeting with Carey, Danis, David Danis, Buxner, and Young in attendance was then held at a Clayton, Missouri, restaurant to explore the possibility of the Blumenfeld's firm joining the two other firms as co-counsel. During the meeting, the attorneys discussed the mechanics of class action litigation, the potential cost of prosecuting the case, the possible impact of NHTSA's investigation into the Chrysler ABS matter, and the handling of attorney's fees. They also briefly discussed the likelihood that T & M would represent Chrysler if the case was brought, and the possibility that Newman would make an issue of any involvement in the case by Carey & Danis. As the Blumenfeld attorneys needed permission from their firm's management committee in order to proceed, no agreement was reached on the firms working together at that time.
After the meeting, Buxner researched the issue of whether Carey and Danis would have a conflict of interest if they were involved in an ABS class action against Chrysler. He concluded that there was no conflict. However, Young believed that if either Carey *1029 or Danis did work on the case, Chrysler would likely file a disqualification motion that would bog down class certification. Accordingly, the Blumenfeld firm offered to serve with Danis, Cooper as co-counsel on the condition that Carey & Danis not be involved. After receiving the Blumenfeld firm's proposal, Carey contacted Beam and informed him that Carey & Danis was out of the case, and that Danis, Cooper and the Blumenfeld firm would undertake the representation. Carey had no further communications with Beam.
Buxner and Alan Gerson of the Blumenfeld firm drafted the petition and the first set of interrogatories and first request for production of documents in the Beam case. In setting forth the facts in that petition, Buxner referred to the Post-Dispatch article, articles that he had retrieved from LEXIS, and conversations that he had with Beam and NHTSA personnel. However, as a form for the petition, he used a copy of the petition filed earlier in the Circuit Court of the City of St. Louis by Carey & Danis in Visintine v. Saab, also a class action case. Buxner had received this document from Richard Cooper of Danis, Cooper, who in turn had obtained it from Danis. In drafting the Visintine petition, Carey and Danis used as a form the second amended complaint filed in Osley, which Danis had taken from T & M. A draft of the Beam petition produced by the Blumenfeld firm lists Carey & Danis and Danis, Cooper as the two firms representing the plaintiffs. The actual Beam petition lists the Blumenfeld firm and Danis, Cooper as co-counsel.
The petition in Beam was filed on August 25, 1995, in the Circuit Court of the City of St. Louis, and Chrysler retained Newman and T & M to defend the company. After receiving the petition, Newman noticed that it was "strikingly similar" to the Osley second amended complaint. Knowing that David Danis was Joseph Danis's father, Newman notified Chrysler of the relationship between Carey, Danis, and David Danis. Chrysler then retained the law firm of Bryan Cave to investigate the link between the Carey & Danis and Danis, Cooper firms.
During the course of its investigation, attorneys at Bryan Cave contacted and interviewed Richard Paletta. Paletta was an acquaintance of both Carey and Danis and worked for a company that sublet office space to Danis, Cooper. He was also a former client of the Blumenfeld firm, and handled that firm's legal malpractice insurance. After being interviewed by Bryan Cave, Paletta called Phil Kaplan, the Blumenfeld firm's managing partner, and advised him that the filing of Beam was being scrutinized because of Carey and Danis's former relationship with T & M.
On September 19, 1995, less than a month after the filing of the Beam petition, the Blumenfeld firm advised David Danis that it was withdrawing from the litigation because of an unspecified conflict of interest. It filed its motion to withdraw the following day. Danis, Cooper then asked Carey & Danis to again become involved in the litigation. On October 3, 1995, Carey & Danis entered their appearance as attorneys of record in Beam. Danis testified that he and Carey decided to join the litigation because there was a need for Beam to be adequately represented and Danis, Cooper did not feel it was up to the task alone.[4]
On November 6, 1995, Chrysler filed a motion to transfer venue from St. Louis City to St. Louis County. On December 13, 1995, Newman wrote a letter addressed to Carey, Danis, and David Danis advising them that Chrysler expected both Carey & Danis and Danis, Cooper to withdraw immediately as counsel of record in Beam. Newman stated, "Chrysler considers your representation of the putative class in the Beam case to be a serious and substantial breach of your duties to maintain its confidences and to protect its interests." Requesting a prompt reply to Chrysler's request for withdrawal, Newman wrote that Chrysler considered the actions of Carey and Danis since leaving T & M to be "wholly inconsistent with their fiduciary obligations." Carey responded to Newman's letter on December 22. In his letter, which was written on Carey & Danis stationary, Carey categorically denied that he or his firm "in *1030 any way breached any duties or violated any confidences of Chrysler Corporation." Carey further stated, "[E]ven though we do not believe that we have done anything wrong, we certainly do not wish to become embroiled in any bitter dispute with you, Chrysler or Thompson & Mitchell regarding a `conflicts' issue." He concluded, "Accordingly, after careful consideration, we have decided to dismiss the Beam lawsuit pending in St. Louis without prejudice and to have no further involvement in that matter."
Carey and Danis testified in their depositions that at the time that they received the December 13 letter from Newman, they were already considering joining the Beam litigation to Chin v. Chrysler, a class action suit pending in federal court in New Jersey. Danis stated that he and Carey viewed the transfer of the Beam litigation to St. Louis County as a negative development because they felt that juries there were more defendant-friendly. In addition, they recognized that consolidating the case with Chin would permit a claim under the federal Magnuson-Moss Act. On December 22, 1995, Danis, Cooper filed a notice of voluntary dismissal without prejudice in the Circuit Court of the City of St. Louis on behalf of Beam.
After dismissing Beam in the Missouri state court, David Danis then joined Beam and approximately thirty to forty additional plaintiffs in the New Jersey action. After David Danis and Danis, Cooper appeared as co-counsel on the first amended complaint in Chin, Newman contacted plaintiffs' other co-counsel, and advised them that Chrysler might file a motion to disqualify. A second amended complaint was then filed in Chin which deleted David Danis and Danis, Cooper as counsel of record.[5] In October 1996, David Danis filed another ABS class action in New Jersey. David Danis withdrew from that action after Chrysler opposed his admission pro hac vice.
Some time after Carey and Danis formed their new law firm, they became members of a small informal group of attorneys who regularly work together on various class action lawsuits. Besides Carey and Danis, this group includes David Danis, Joseph Phebus of Urbana, Illinois, John Deakle of Hattiesburg, Mississippi, Michael Campbell of Miami, Florida, and J.L. Chestnut of Selma, Alabama. All of the members of this group are or have been involved in ABS class action litigation against Chrysler.
On October 11, 1995, Deakle filed Sakalarios v. Chrysler, an ABS class action lawsuit against Chrysler, in federal district court in Mississippi. Prior to the filing of Sakalarios, Danis gave Deakle a copy of the petition filed in Beam. The complaint in Sakalarios is quite similar to the Beam petition (for example, the second paragraph in Beam is identical to its counterpart in Sakalarios). Simultaneous with his filing of Sakalarios, Deakle sent a letter to Carey & Danis enclosing a copy of the Sakalarios complaint and discussing a potential division of fees. For reasons not identified by any of the parties, the Sakalarios suit was subsequently dismissed without prejudice. Carey and Danis deny providing Deakle with any confidential information concerning Chrysler.
On June 17, 1996, Chestnut filed an ABS class action lawsuit styled Brown v. Chrysler in Alabama state court. Chestnut, Deakle, Phebus, and Campbell represent the Brown plaintiffs. David Danis, although not an attorney of record, may share in any fees if plaintiffs prevail in the case, which is still pending. Carey and Danis deny participating in the prosecution of Brown and deny providing any confidential Chrysler information to plaintiffs' attorneys in Brown. Documents obtained from Deakle, however, reveal that he sent copies of numerous letters and memoranda related to the Brown suit to Carey and Danis.

II. Discussion

In determining whether summary judgment should issue pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the facts, and inferences drawn therefrom, are viewed in the light most favorable to the nonmoving party. The moving party bears the burden of both establishing the absence *1031 of a genuine issue of material fact and showing that it is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Once the moving party has met this burden, however, the non-moving party may not rest on the allegations in its pleadings, but by affidavit or other evidence must set forth specific facts showing that a genuine issue of material fact exists. Fed.R.Civ.P. 56(e). If the non-moving party bears the burden of proof at trial, summary judgment is warranted if the non-movant is unable to make a showing sufficient to establish the existence of an element essential to its case. Lujan v. National Wildlife Fed'n, 497 U.S. 871, 884, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). The substantive law of Missouri controls this diversity action. St. Paul Fire & Marine Ins. Co. v. Missouri United School Ins. Council, 98 F.3d 343, 345 (8th Cir.1996). Under the Erie doctrine, a federal court's exercise of its diversity jurisdiction requires that it ascertain and apply the governing state law at the time of decision. Erie R.R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938).

A. Count I: Breach of Fiduciary Duty/Constructive Fraud

In count I of its complaint, Chrysler charges that Carey and Danis breached fiduciary duties of confidentiality and loyalty which they owed Chrysler by initiating and furthering substantially related litigation against the company after leaving T & M.
Rule 4 of the Missouri Supreme Court incorporates the Rules of Professional Conduct for lawyers practicing in the state. Rule 1.9 of those rules provides, in pertinent part:
A lawyer who has formerly represented a client in a matter shall not thereafter:
(a) represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation.
Clearly, the fact that defendants' conduct in this case may have violated Rule 1.9 is not, in and of itself, a basis for imposing tort liability. See Greening v. Klamen, 652 S.W.2d 730, 734 (Mo.Ct.App.1983) (declining to "enlarge upon any common law obligations of competence and fiduciary obligation that may exist ... by imposing liability for [an] alleged negligent breach of Disciplinary Rules"). On the other hand, the argument that a conflict of interest may violate not only ethical rules but also the common law is "far from novel." Hendry v. Pelland, 73 F.3d 397, 401 (D.C.Cir.1996); see Newman v. Silver, 713 F.2d 14, 17 (2d Cir.1983); Woodruff v. Tomlin, 616 F.2d 924, 936 (6th Cir.) (en banc), cert. denied, 449 U.S. 888, 101 S.Ct. 246, 66 L.Ed.2d 114 (1980).
In the recent case of Klemme v. Best, 941 S.W.2d 493, 495 (Mo. banc 1997), the Missouri Supreme Court made clear that regardless of what its rules of professional conduct might provide, an attorney owes his client "basic fiduciary obligations of undivided loyalty and confidentiality." Id. at 495. In Klemme, a police officer, Klemme, sued his former attorney, Best, for breach of fiduciary duty after Best represented him and six other Columbia, Missouri, police officers in a 42 U.S.C. § 1983 lawsuit that arose out of a shooting. Klemme claimed that prior to the complaint's filing, plaintiffs' counsel showed Best a draft copy of the petition and that Best told plaintiffs' counsel that one of the officers named therein (but not Klemme) was not a participant in the shooting. As a result, plaintiffs' counsel eliminated that officer as a defendant in the filed complaint. Klemme alleged that Best knew that Klemme also was not involved in the shooting and should have so informed plaintiffs' counsel. (Klemme charged that Best kept silent to advance the interest of the city and the city's selfinsured association, which had retained Best.) After the complaint was filed, the court dismissed Klemme with prejudice because the facts did not support a claim against him. Klemme then filed suit against Best in Missouri circuit court. The circuit court dismissed on the grounds that Klemme's petition failed to state a claim and that even if it stated a claim, it was barred by the statute of limitations. The supreme court *1032 affirmed on the statute of limitations ground, but held that "an attorney may breach a fiduciary duty to a client at any time during their relationship." Id. at 496.
Klemme demonstrates two points relevant here. First, a lawyer's conduct that violates the professional rules can also result in civil liability. Although Best's decision not to reveal Klemme's non-involvement in the shooting incident certainly violated Rule 1.7(b) (which provides that an attorney shall not represent a client if that representation "may be materially limited by the lawyer's responsibilities to another client or to a third person"), the Missouri Supreme Court concluded that Klemme's petition stated a claim for breach of fiduciary duty against Best  and did so without making any reference to the rule. Second, Klemme shows that the duties of confidentiality and loyalty are not one and the same. The Klemme court found that a client could prevail on a claim of breach of fiduciary duty simply by showing that his attorney had been disloyal in representing him.
These two points are further demonstrated by Williams v. Preman, 911 S.W.2d 288 (Mo. Ct.App.1995).[6] In Williams, the plaintiff, Williams, brought an action for legal malpractice and breach of fiduciary duty against his former attorney, Preman. In the underlying case, Preman had assisted Williams in preparing Williams' bankruptcy petition. One of Williams' creditors filed an objection to Williams' discharge on the ground that Williams was guilty of intentional concealment of assets. Williams then engaged a new attorney, who moved for summary judgment on the objection to the discharge. In that motion, Williams contended that any concealment was Preman's fault because he had prepared the bankruptcy forms and schedules. Preman then provided an affidavit to the objecting creditor for use in his response to the summary judgment motion. In this affidavit, Preman denied that the nondisclosure was based on his advice. The trial court denied Williams' motion for summary judgment. In the legal malpractice and breach of fiduciary duty action that followed, Williams alleged that Preman breached his fiduciary duty of loyalty by providing the affidavit in the underlying action. After the circuit court directed a verdict for Preman on the breach of fiduciary duty claim, Williams appealed, and the Missouri Court of Appeals reversed.
Although the court of appeals expressed its agreement with Preman's argument that he could not be held liable for breach of an ethical rule, 911 S.W.2d at 300, it stated, "Williams is not seeking to hold ... Preman liable for the violation of an ethical rule. He is seeking to hold [him] liable for breach of fiduciary duty." Id. at 300-01. That alleged breach, the court explained, was not of Preman's duty of confidentiality: "The affidavit was alleged to be wrongful, not because it disclosed a confidential communication, but because, according to Williams, it was falsely accusatory ...." Id. at 301. In other words, Williams was charging that his former attorney had breached a duty of loyalty that was independent of any duty of confidentiality. In remanding the case for a new trial on the breach of fiduciary duty claim, the court of appeals noted that there was "substantial evidence" supporting Williams' claim that he was damaged by Preman's "alleged disloyal actions." Id. at 302.
Williams makes the further point that a lawyer's fiduciary duties to his client continue even after the representation ceases, and a breach of that duty may give rise to liability. The court stated, "a breach of trust which arises out of the [attorney-client] relationship, but occurs outside the time frame of the representation of the plaintiff, could be a breach of fiduciary duty." Id. at 301. The court declared, "`The relation between attorney and client is fiduciary and binds the attorney from any personal advantage from the abuse of that reposed confidence.'" Id. (quoting Shaffer v. Terrydale Management Corp., 648 S.W.2d 595, 605 (Mo.Ct.App. 1983)).
*1033 The Missouri Supreme Court long ago declared, "`The nature of a lawyer's profession necessitates the utmost good faith toward his client and the highest loyalty and devotion to his client's interests.'" Gardine v. Cottey, 360 Mo. 681, 230 S.W.2d 731, 739 (1950) (quoting In re Thomasson's Estate, 346 Mo. 911, 144 S.W.2d 79, 83 (1940)). It then went on to state that the attorney-client relationship is "`highly fiduciary and of a very delicate, exacting and confidential nature, requiring a very high degree of fidelity and good faith.'" Id. (quoting Laughlin v. Boatmen's Nat. Bank, 163 S.W.2d 761, 765 (Mo.1942)). Given these exacting standards and the decisions in Klemme and Williams, this Court believes that a Missouri court would find that Carey and Danis owed Chrysler continuing fiduciary duties of confidentiality and loyalty.
In Klemme, the court set forth the elements of the tort of breach of fiduciary duty: (1) an attorney-client relationship; (2) breach of a fiduciary obligation by the attorney; (3) proximate causation; (4) damages; and (5) the nonexistence of any other recognized tort encompassing the facts alleged. 941 S.W.2d at 496. The parties here do not contest the existence of elements one and five. The issues of breach, causation, and damages, however, are fiercely disputed.
The Court will first address Chrysler's claim that Carey and Danis breached their duty of confidentiality to the company. At the outset, the Court observes that Chrysler has not identified any instance in which either Carey or Danis explicitly used any of the aforementioned confidential information after their departure from T & M. The only document that the company can point to specifically is the second amended complaint in Osley. However, because that complaint was filed, it is a public record  not a confidential one. Cain v. Hershewe, 760 S.W.2d 146, 150 (Mo.Ct.App.1988) (noting that an attorney's disclosure of a public record is not a violation of his duty to protect the confidential communications of his client). Nevertheless, Chrysler claims a breach of duty should be presumed if the Court finds that the T & M lawsuits and the Beam case are "substantially related" within the meaning of Rule 1.9 of the Rules of Professional Conduct. Chrysler also argues that because Carey and Danis could not possibly have "compartmentalized" the confidential information to which they had access at T & M in deciding whether to bring the Beam case, a reasonable inference should be drawn that they did indeed use it.
According to Chrysler, in evaluating the merits of bringing an ABS class action against the company, Carey and Danis must have brought to bear the knowledge of the company that they gained while at T & M, and, in so doing, breached their fiduciary duty of confidentiality. It is uncontroverted that during their time at T & M, Carey, especially, and Danis, to a lesser extent, were intimately involved in planning and implementing Chrysler's defense strategy in both the Osley and the Latch class actions. Chrysler has presented substantial evidence that although the components and vehicles involved in these cases were entirely different, Chrysler's defense strategy and its tactics regarding such things as damages, expert witnesses, class certification, motion practice, and defenses, remained the same. Chrysler contends that the specific defect alleged in a particular class action has little relevance in the context of the litigation. Defendants dispute this contention, and both parties have presented substantial evidence and argument in support of their respective positions.
The Court believes that this argument shows that genuine issues of material fact exist, because when all the facts are viewed in the light most favorable to one party or the other, reasonable minds might differ. Certainly, a reasonable juror might find from all the evidence and inferences therefrom that Carey and Danis in fact used confidential information. On the other hand, because Chrysler can point to no particular item of confidential information used, a reasonable juror might find no breach. The Court does not believe that under Missouri law a breach is presumed or somehow established as a matter of law if the matters are "substantially related" under Rule 1.9. Instead, the evidence of a relationship, or lack thereof, between the cases are facts that the *1034 jury may consider in determining whether it should draw an inference that confidential information was used. Neither party is entitled to summary judgment.
For the same reasons, the Court believes that a reasonable juror could find or not find that defendants breached their duty of loyalty to Chrysler. The undisputed facts in this case show that Carey and Danis elected to prosecute a class action product liability lawsuit against Chrysler within a year after leaving a firm where they had performed significant work defending Chrysler in product liability class actions. Given their intimate familiarity with Chrysler's approach to vehicular defect class actions, a reasonable juror could find that it was a breach of loyalty for them to turn around and bring such a lawsuit against Chrysler. Again, neither party is entitled to summary judgment.
Also for the jury are the issues of causation and damages. In Missouri, the "but for" test for causation applies in all cases except those involving two independent torts, either of which is sufficient in and of itself to cause injury. Callahan v. Cardinal Glennon Hospital, 863 S.W.2d 852, 862-63 (Mo. banc 1993). That exception is inapplicable here, and thus Chrysler must show that but for Carey and Danis's breach of loyalty, it would not have suffered injury. See Klemme, 941 S.W.2d at 496 (element of proximate causation in breach of fiduciary duty and legal malpractice cases is identical).
Missouri case law further provides that causation is generally an issue left to the trier of fact. Peterson v. Summit Fitness, Inc., 920 S.W.2d 928, 936 (Mo.Ct. App.1996); Williams, 911 S.W.2d at 295. If reasonable minds could differ as to whether the defendants' actions caused the plaintiff's injuries, the issue is for the factfinder. Schaffer v. Bess, 822 S.W.2d 871, 876 (Mo.Ct. App.1991). In this case, even if it is established that Carey and Danis breached their duty of confidentiality or loyalty to Chrysler, a factual dispute would remain as to whether that breach caused damage to Chrysler. To cite just one example, with respect to the filing of the Beam lawsuit, Beam testified in his deposition that he was considering bringing a "lemon law" or class action suit against Chrysler even prior to his first meeting with Carey. On the other hand, Carey testified that he told Beam that the case "could be ideally suited as a class action suit."
The assessment of damages is also the function of the jury. King v. Unidynamics Corp., 943 S.W.2d 262, 268 (Mo.Ct. App.1997); McGowan v. Hoffman, 609 S.W.2d 160, 167 (Mo.Ct.App.1980). Chrysler claims as damages the following: (1) legal expenses paid to Bryan Cave in connection with that firm's investigation of the link between the Carey & Danis and Danis, Cooper firms following the filing of the Beam petition, (2) attorney's fees and expenses incurred in defending Beam, and (3) fees and expenses incurred in defending Sakalarios. Defendants argue that in Missouri, a plaintiff cannot recover attorney's fees expended in ongoing litigation absent statutory authorization or agreement of the parties. Arnold v. Edelman, 392 S.W.2d 231, 239 (Mo.1965). Although that is the general rule, it is not applicable when the attorney's fees were incurred in collateral litigation. Id. "`Where the natural and proximate result of a wrong or breach of duty is to involve the wronged party in collateral litigation, reasonable attorneys' fees necessarily and in good faith incurred in protecting himself from the injurious consequence thereof are proper items of damage.'" Johnson v. Mercantile Trust Co. Nat'l Ass'n, 510 S.W.2d 33, 40 (Mo.1974) (quoting Missouri ex rel. Moore v. Morant, 266 S.W.2d 723, 727 (Mo.Ct.App.1954)). For a party to recover attorney's fees under the collateral litigation exception, it must have incurred the fees as a result of suing, or being sued by, an outside third party. Brown v. Mercantile Bank, 820 S.W.2d 327, 340 (Mo.Ct.App.1991). That is the case here. Chrysler alleges that the Beam and Sakalarios cases were brought as a result of Carey and Danis's breach of the fiduciary duties that they owed the company.
Under Rule 56(c), Fed.R.Civ.P., a court is forbidden from entering summary judgment in a case where disputes of material fact remain. Here, the Court finds that such disputes persist on the issues of breach, causation, *1035 and damages, and will therefore deny both motions for summary judgment.

B. Count II: Tampering with Computer Data

Count II of Chrysler's second amended complaint charges Carey and Danis with tampering with computer data and computer equipment in violation of Mo.Rev.Stat. § 537.525. Specifically, Chrysler alleges that defendants "knowingly and without authorization or reasonable grounds to believe they had authorization, disclosed and took computer data owned by Chrysler" that was stored on T & M's LAN.
Section 537.525.1 provides, in pertinent part:
In addition to any other civil remedy available, the owner or lessee of the computer system, computer network, computer program, computer service or data may bring a civil action against any person who violates sections 569.095 to 569.099, RSMo, for compensatory damages ....
Section 569.095 in turn provides, in pertinent part:
A person commits the crime of tampering with computer data if he knowingly and without authorization or without reasonable grounds to believe he has such authorization:
. . . . .
(3) Discloses or takes data, programs, or supporting documentation, residing or existing internal or external to a computer, computer system, or computer network; or
. . . . .
(6) Receives, retains, uses, or discloses any data he knows or believes was obtained in violation of this subsection.
Carey and Danis acknowledge that they took various Chrysler work product "such as the pleading, discovery, and research that would later be included in their form file." Citing Corrigan v. Armstrong, Teasdale, Schlafly, Davis & Dicus, 824 S.W.2d 92 (Mo. Ct.App.1992), they contend that Chrysler had no ownership interest in these documents. In Corrigan, the plaintiff, a widow of a former client of Armstrong, Teasdale, brought suit against the firm demanding delivery of all documents relating to Armstrong's representation of her late husband. Although the firm agreed to provide the plaintiff with all "final documents, such as wills, trusts and contracts," id. at 94, it refused to relinquish any other documents. The court of appeals held that the client of a law firm had "at best" a right of access to the information in these documents. Id. at 95.
The Court does not believe that Corrigan controls this case. The Corrigan court explicitly limited its holding to "non-final" documents retained by the firm: "[F]or our purposes here, we construe [plaintiff's] petition as not requesting delivery of these final documents." Id. at 94. With respect to these final documents, the court stated, "No equitable principle or fiduciary duty is needed to create or justify Mr. Corrigan's ownership of any final documents he requested and paid for. Legal principles do that." Id. at 96 (emphasis added). But cf. In re Cupples, 952 S.W.2d 226, 234 (Mo. banc 1997)("The client's files belong to the client, not to the attorney representing the client. The client may direct an attorney or firm to transmit the file to newly retained counsel."). In this case, Chrysler has adduced evidence that Danis copied the second amended complaint in Osley  a final document  from T & M's LAN.
Section 569.095 makes clear that liability does not attach if the purported offender had "reasonable grounds" to believe he had authorization to access or take the data in question. In his affidavit, Newman contends that "Carey and Danis were not given authorization to copy Chrysler data and to take it with them when they left T & M." While Carey and Danis admit that they "did not have express authority" to take the documents at issue, they claim that they "reasonably believed" that neither Chrysler nor T & M would object to their doing so. Matthew Fairless, a T & M attorney, was asked at his deposition whether he thought it would be appropriate for him to take documents that he had prepared at T & M with him in the event he left the firm. He replied, "I have never been faced with a situation where I *1036 had an intention to leave [T & M], so I'm not really sure what I would determine in that case what would be acceptable to me to take or appropriate for me to take." He further stated that as to "clean duplicates of documents filed with adjudicated [sic] bodies, then I would likely think it appropriate to take them." In his deposition, Carey testified, "There are a number of people that ... left [T & M] during the course of time I was there and every lawyer I knew at the firm maintained a form file and considered it their personal property and took it with them when they left." Given the above statements, it is obvious that a fact dispute remains as to whether Carey and Danis had "reasonable grounds" to believe their removal of documents from T & M was authorized.

C. Count III: Breach of Contract

In count III of its second amended complaint, Chrysler alleges that Carey and Danis breached the written confidentiality agreements that they signed upon becoming associates of T & M by "disclosing and using confidential information that came to their attention as associates of [T & M] and during their representation of Chrysler." While acknowledging that it was not a party to these agreements, Chrysler contends that it was a "primary beneficiary" of the agreements.
In order to recover in an action for breach of contract in Missouri, a plaintiff must show (1) the existence of an agreement, (2) its terms, (3) a breach thereof, and (4) resulting damages. Allen v. Watson, 935 S.W.2d 322, 326 (Mo.Ct.App.1996); Slone v. Purina Mills, Inc. 927 S.W.2d 358, 367 (Mo. Ct.App.1996). Under third-party beneficiary principles, a party that is not privy to a contract but is benefited by it may maintain a cause of action for its breach. Tractor-Trailer Supply Co. v. NCR Corp., 873 S.W.2d 627, 630 (Mo.Ct.App.1994). However, the contract must "clearly express" an intent to benefit either that party or an identifiable class of which that party is a member. Peters v. Employers Mut. Casualty Co., 853 S.W.2d 300, 301 (Mo. banc 1993). The construction to be given a written contract is ordinarily a question of law. Anchor Centre Partners, Ltd. v. Mercantile Bank, N.A., 803 S.W.2d 23, 32 (Mo. banc 1991); Miceli v. Dierberg, 773 S.W.2d 154, 156 (Mo.Ct.App. 1989).
With respect to the confidentiality agreement signed by Carey, the Court finds that Chrysler is not a third-party beneficiary of this contract. The agreement contains only a few references to T & M clients, and those references pertain only to the handling to be given any new business that Carey might be successful in soliciting.[7] The document does not "clearly express" an intent to benefit Chrysler in particular or T & M clients in general. The Court will therefore grant Carey's summary judgment motion on the contract claim.
However, the Court reaches a different conclusion regarding Danis's confidentiality agreement with T & M. With respect to that document, the inescapable conclusion is that Chrysler, as a T & M client, is a third-party beneficiary. The agreement explicitly warns that "even the slightest reference" to work that T & M undertook "could have a major adverse impact on the client and, in turn, the Firm." (emphasis added). It further states that "a client's confidence is not expected to be shared" with anyone outside the firm or even with T & M lawyers who do not have a "need to know." The agreement "clearly expresses" an intent to benefit Chrysler and other T & M clients. As explained above, Chrysler has not adduced any direct evidence that Danis disclosed or used confidential Chrysler information after leaving T & M. However, the record does contain a substantial amount of circumstantial evidence from which a reasonable factfinder could conclude that such disclosure or use did indeed take place. The issue is one for the jury, as is the issue of damages, and so the Court will deny Danis' and plaintiff's motion for summary judgment on Count III.

*1037 D. Count IV: Request for Injunctive Relief

In count IV of its second amended complaint, Chrysler requests that the Court enjoin Carey and Danis from "breaching their duties of confidentiality, loyalty and fidelity by disclosing, using and exploiting confidential information obtained by them during the scope of their representation of Chrysler to further the goals of others in substantially related litigation pursued against Chrysler."
Under Missouri law, a party seeking an injunction must show that irreparable harm will otherwise result and that it has no adequate remedy at law. Eberle v. Missouri, 779 S.W.2d 302, 304 (Mo.Ct.App. 1989). Whether injunctive relief should issue is a matter of judicial discretion. Hardesty v. Mr. Cribbin's Old House, Inc., 679 S.W.2d 343, 348 (Mo.Ct.App.1984). An injunction is a "harsh remedy to be used sparingly and only in clear cases." Id. Given these standards, the Court believes it appropriate to postpone any ruling on Chrysler's request for injunctive relief pending the outcome of the trial in this matter. This case remains set for trial on September 7, 1998.
Accordingly,
IT IS HEREBY ORDERED that plaintiff's motion for summary judgment [# 116] is denied.
IT IS FURTHER ORDERED that defendants' motion for summary judgment [# 114] is granted as to count III with respect to defendant John Carey only and is denied in all other respects.
IT IS FURTHER ORDERED that plaintiff's motion to compel production of documents from Danis, Cooper [# 136] is denied as moot.
NOTES
[1] The motions for summary judgment were actually directed to the first amended complaint, but plaintiff was granted leave to file the second amended complaint during the briefing of those motions. By agreement of all parties, the Court will consider the cross-motions for summary judgment as being directed toward the second amended complaint.
[2] Although the parties have numerous factual disputes, all facts set forth here are undisputed.
[3] Unless necessary for the purpose of clarity, the Court will hereinafter refer to Joseph Danis as "Danis." The Court will refer to Danis's father, David Danis, who is also involved in the facts surrounding this litigation, by his full name.
[4] David Danis testified that in 1994, the year prior to Carey & Danis's formation, the amount of plaintiffs' class action work performed by him constituted a "small percent, if any."
[5] In the memorandum in support of their motion for summary judgment, defendants state that the Beam plaintiffs were dismissed from Chin as well.
[6] Williams was overruled by Klemme to the extent it had held that an attorney could not breach a fiduciary duty to his client during their relationship and could be liable only for malpractice. Klemme, 941 S.W.2d at 496.
[7] For example, the document states, "Work which you perform for clients who come directly to you shall be work for the account of the firm, and fees collected will be established after conference with you as to the amount to be charged."